In the Matter of the Estate of BENJAMIN ADRIANCE, Deceased.

Surrogate's Court, Kings County, October 31, 1932.

*James F. Hubbell*, for the petitioners.

*Louis F. Stumpf*, for the contestants Maude Adriance Roe and Lillian Adriance Bowen.

*George W. Thomas*, for contestant Cora A. Millard.

*Henry C. Turner*, referee.

*John H. Schmid*, special guardian.

*Adrian D. Adriance*, appearing in person.

*Jonathan Holden*, for North River Mortgage Company.

WINGATE, S.    Neither the diligence of counsel nor the independent research of the court has disclosed a precedent either of English or American courts which in any direct manner bears upon the main issue in this case.    The controversy, in brief, concerns the propriety of a surcharge against testamentary trustees by reason of their investment in securities which, at the time of purchase, were not authorized by law, but which subsequently, during a continuance of their retention, became legal investments.

The pertinent facts upon which a decision must be based are not in dispute and are, indeed, in part stipulated.    In April, 1928, the trustees, who are now accounting, received from themselves as executors the sum of $260,232.65, pursuant to a decree of this ccurt.    After a certain amount of preliminary investigation regarding the responsibility of the American Bond and Mortgage Company, they entered into negotiations with representatives of that concern for the investment of a portion of this fund, and early in June purchased $100,000 par value of participation certificates in a first mortgage on the property of Hotel Hildebrecht, receiving at the same time an agreement from the seller that should they be advised that these bonds were not authorized by law for the investment of New York trust funds, an exchange for other issues possessing such characteristic would be made.    The mortgagor on these obligations was a New Jersey corporation and the property incumbered was located in that State, wherefore counsel advised them that the securities did not conform to the requirements of section 111 of the Decedent Estate Law and section 21 of the Personal Property Law and were consequently unauthorized investments for trust funds in this State.    Shortly thereafter negotiations for their exchange were entered into between the trustees and the American Bond and Mortgage Company, as a result of which it was arranged that the Hotel Hildebrecht bonds should be returned and certain bonds upon property on Riverside drive and One Hundred and Third street, Manhattan, owned by Roerich Museum, a New York corporation, should be substituted.

It was represented by the American Bond and Mortgage Company, through its sales manager and salesmen, that the latter bonds were a legally authorized investment for New York trust funds; that the property upon which they were secured was improved by a twenty-four story building which was sixty per cent rented; and that an opinion had been rendered by the firm of Stoddard & Mark, attorneys, of New York city, affirming the legality of the issue. The trustees relied wholly upon these statements and made no independent investigation of the facts. As a matter of fact, the representations were wholly false. No building had been built at the site indicated, and obviously it was not rented in whole or in part. Furthermore, the opinion of Stoddard & Mark, which had actually been rendered, was to the effect that if the projected structure was actually completed as planned, it would be an authorized investment for trust funds.

The negotiations were, however, consummated, and on July 12, 1928, interim certificates for the new bonds were delivered to the trustees in exchange for the Hotel Hildebrecht bonds.

As a matter of fact, the building was actually completed according to plans on August 12, 1929, and, according to the stipulation signed by all of the parties to this proceeding, on that date the mortgaged property possessed a total value of $2,984,600, made up of a land value of $610,000, and value of building of $2,374,600. The total authorized bond issue was $1,925,000, as a result of which, on the agreed value of the security, the investment became one authorized for trust funds on that date, within the provisions of section 111 of the Decedent Estate Law and section 21 of the Personal Property Law. The testimony adduced on behalf of the trustees demonstrated that they paid par value for these securities on their original acquisition and that on August 12, 1929, when the issue became a legally authorized investment for trust funds, they were still selling at par.

Subsequent to that date the American Bond and Mortgage Company became involved in financial difficulties and since it was merely through its instrumentality that a market for real estate securities sold by it had been maintained, these securities depreciated in selling price. It is familiar history to all that, beginning in October, 1929, there was a marked depression in all security prices owing to the unusual business conditions prevailing throughout the world. Small blocks of securities similar to those purchased by the trustees have since sold at a price as low as fifty cents on the dollar. It was, however, testified that up to the time of the hearing herein, there had been no default by the mortgagor in payment either of amortization or interest on the mortgage.

Although the *bona fides* of the trustees has been questioned by no one, objections have been filed on behalf of three sets of parties. These are directed, *first*, to the unauthorized nature of the original investment, and, *second*, to the improvidence of the trustees in placing so large a proportion of the fund in their hands in a single security. The former objection has been interposed by all contesting parties, the latter being added merely by the special guardian for infant remaindermen.

Unquestionably, were an attempt to be made to realize upon these securities at this time, the trust would suffer as ubstantial loss, and the chief question at issue is whether the admitted fact that the investment as originally made by the trustees was not one authorized by the statutes of the State of New York, is, in and of itself, sufficient to warrant their surcharge by a sum which would be required to bring this portion of the trust fund up to its original value.

In the absence of any direct authority on the subject, recourse must be had to basic principles for the solution of this problem. In *Boronkay* v. *Robinson & Carpenter* (247 N. Y. 365) the court says (at p. 368): "Even where a statutory command is not obeyed there is * * * no liability where the injury is not the result of disobedience of the statute." The case in which this statement appears was one of negligence, but no reason is perceived why the principle enunciated is not one of universal application. In the investigation of the causes of any loss or damage, it is customary to find that various concurring events have contributed more or less directly to the result, but it is primary that liability for the resulting injury is to be predicated only upon the particular act which is determined to have been the "proximate cause" of the damage. This has been noted in many cases, perhaps nowhere more clearly than in the very recent case of *Comstock* v. *Wilson* (257 N. Y. 231), where Judge LEHMAN, speaking for the unanimous court, says (at p. 235): "Only for consequences which follow from an infraction of a duty, to the injured party, from an invasion of his legal rights, is legal liability imposed. Even then legal liability does not extend beyond 'proximate' consequences. Practical considerations must at times determine the bounds of correlative rights and duties as well as the point beyond which the courts will decline to trace causal connection."

The basic principles of the doctrine of proximate cause are clearly defined in *Laidlaw* v. *Sage* (158 N. Y. 73). The court there says (beginning at p. 98): "The doctrine of proximate cause is a fundamental rule of the law of damages, to the effect that damages are

to be allowed in general only for the proximate consequences of the wrong, * * *.

" Bishop, in his work on Non-Contract Law (§ 42), in discussing this question, after remarking as to the uncertainty with which the term ' proximate cause ' may have been used and applied, and after defining the terms ' proximate ' and ' remote ' cause, says: ' If, after the cause in question has been in operation some independent force comes in and produces an injury not its natural or probable effect, the author of the cause is not responsible.'

" In Shearman & Redfield on the Law of Negligence (§ 26) it is said: ' The breach of duty upon which an action is brought must be not only the cause but the proximate cause of the damage to the plaintiff. * * * The proximate cause of an event must be understood to be that which, in a natural and continuous sequence, unbroken by any new cause, produces that event, and without which that event would not have occurred.' "

In the opinion of the court this principle is entirely applicable to the case at bar. If the language of section 111 of the Decedent Estate Law be scrutinized, it will be observed that the provisions thereof are permissive merely, in that it is provided that " an executor * * * *may* invest the same " in the specified class of securities. His failure to do so casts upon him an onus of explanation, and a liability for loss provided the loss accrues by reason of his failure to adopt the variety of investments enumerated by the Legislature. No case has been found in which it is declared that a fiduciary making an unauthorized investment is, *ipso facto,* guilty of a devastavit, irrespective of the ultimate result of his act. If loss occurs by reason of his act, he becomes *prima facie* liable. Indeed, it would probably be held that such a loss, demonstrated to be a direct result of his act, would raise an irrefutable presumption of liability to the extent that the trust had suffered from his unauthorized act. This, however, is far from saying that by reason of such act he has, in effect, outlawed himself from the company of faithful fiduciaries. In practical effect, his purchase of such securities results in the imposition upon him of a contract of guaranty in favor of the estate, that a loss will not result thereto by reason of his act.

It follows, therefore, that the only theory upon which recovery against the trustee can be predicated is that his act of unauthorized investment was the cause of loss to the estate. But here, as in any other case of cause and effect, that act, to sustain a recovery against him, must be shown to have been the proximate cause of the loss. In this respect, the provisions of section 111 of the Decedent Estate Law possess no higher sanctity than those of any

other enactment, and it has invariably been held that although the defendant may have violated a statute or ordinance, and loss or damage has occurred, he will not be held responsible merely by reason of his violation of the statute, unless such violation was the proximate cause of the injury. This was the express holding of *Boronkay* v. *Robinson & Carpenter (supra)*, and is further demonstrated in many cases, among which may be cited *Koch* v. *Fox* (71 App. Div. 288), in which the court says (at p. 295): " Even if the ordinance imposed a duty on the owner which affords a cause of action to the person injured through his omission to comply therewith, yet the failure of the owner to erect the shed was not the proximate cause of the injury. The accident would not have occurred but for the negligence of the employees of Zimmerman, as found by the jury. * * *

" Although the omission of the owner to comply with the ordinance may have been a remote cause, it is manifest that the intervening negligence of the contractor was the direct proximate cause of the injuries, and in these circumstances the owner would not be liable." (See, also, *Wheeler* v. *Norton*, 92 App. Div. 368, 372.)

In the case at bar the unauthorized character of the investment ceased to be an effective cause of loss when that investment came within the legal definition of one proper under the provisions of the statute. Thereafter, other causes, including the failure of the seller of the bonds and the world wide depression of security prices, intervened, and became the causative influences leading to the present recession in the market values of the securities in question. Had the trustees in the present case sold these securities on the 11th day of August, 1929, and realized the full price paid for them, so that they had this sum in their hands for investment on the succeeding day, they would have been perfectly free, so far as the provisions of the statute are concerned, to have placed that sum in the identical securities which they had sold on the previous day and would not have been subject to criticism on this ground for so doing. The result in the present case is identical with that which would have occurred had such action taken place, and it cannot be supposed that their failure to indulge in such a futile *hocus pocus* can alter the attitude of a court of equity toward their acts.

The only case in any way remotely resembling the present which the research of the court has disclosed is *Matter of Darlington* (245 Penn. St. 212). There the trustee purchased certain unauthorized securities which were subsequently, and without her fault, stolen by her attorney. In overruling the report of the auditor, which had been confirmed by the Orphans' Court, holding her liable

therefor by reason of the fact that the securities were unauthorized for the investment of trust funds, the court said (at p. 217): " Where a trustee mingles the money of the trust estate with his own, or invests it in his own name, it may be well held that the use of the money was for himself, not for the estate, and when he is called to account, the only answer he may be permitted to make is the production of the funds. . This is because he has committed a breach of the trust. The law, however, does not forbid or make unlawful an investment in securities not of a class expressly authorized by the acts of assembly. Where such an investment is made for the trust estate there is not a breach of trust, although there may be liability for loss by reason of depreciation. The securities in question were purchased for and held by and in the name of the trust estate and there was not a breach of trust in making the investments. Since they were accounted for, * * * there was no ground for a surcharge because of the illegality of the investment. The only charge is that they were not safely kept by the trustees and this charge was not sustained by the auditor."

Viewing the matter solely from the standpoint of the burden of proof, it is, of course, obvious that the objecting parties had the burden of demonstrating that any losses of assets by the trustee are attributable to his act or neglect. (*Matter of Taft*, 143 Misc. 387, 389; *Matter of Shafran*, Id. 754, 759; *Matter of Richman*, 142 id. 103, 109, and cases cited.) The showing of the original purchase of the unauthorized securities by the trustees shifted to them the burden of going forward with an exculpating demonstration, which in turn was made by the stipulation that the issue had become legal, whereupon the burden again shifted to the objecting parties to establish that the act of the accountants in making the purchase was the active proximate cause of the loss. This burden the objectors have not met, wherefore, the principle stated in *Searles* v. *Manhattan Railway Co.* (101 N. Y. 661, 662) in another connection, becomes pertinent: " When the fact is that the damages claimed in an action were occasioned by one of two causes, for one of which the defendant is responsibile and the other of which it is not responsible, the plaintiff must fail if his evidence does not show that the damage was produced by the former cause. And he must fail also if it is just as probable that they were caused by the one as by the other, as the plaintiff is bound to make out his case by the preponderance of evidence. The jury must not be left to mere conjecture."

It follows, therefore, that the objection that the trustees are subject to surcharge by reason of their original purchase of these securities must be overruled.

There remains for consideration the second objection of the special guardian respecting the alleged improvidence of the investment of somewhat less than two-fifths of the total fund in a single security. On this issue considerable testimony was taken both before the court and the referee appointed in the proceeding. This demonstrated that the property upon which the securities purchased by the trustees were a co-ordinate first lien, was a large and well-equipped building of twenty-four stories, the upper twenty-one of which were laid out in attractive and rentable apartments. A portion of the first two floors was occupied by the Roerich Museum, which was a cultural enterprise apparently underwritten by substantial financial backing. This would tend to increase rather than diminish the solidity and attractiveness of the investment as assuring the building of the presence of a desirable tenant.

The facts adduced before the referee, that the enterprise had been conducted at a loss for the last two or three years, cannot be accepted as a momentous reflection upon the ordinary financial stability of the enterprise in view of the abnormal conditions which have prevailed during this period. If all concerns which have failed to show a profit since October, 1929, were to be wiped out of existence, few, indeed, would remain.

It is entirely true that many financial authorities advocate wide diversity of investment. It is equally true that others as strenuously affirm the contrary, and agree with the familiar admonition of the late Andrew Carnegie: " Put all your eggs in one basket and watch the basket." This divergence of sentiment among the financial authorities would render a judicial decision in favor of either school of thought an *ultra* hazardous undertaking. For present purposes, suffice it to say that no such demonstration of improvidence on the part of the trustees in investing less than two-fifths of their fund in these securities has been made, as to justify the court in declaring as a matter of law that their action was improper.

It follows, therefore, that both of the noted objections to the account must be overruled.

Proceed accordingly.