Johh J. McCall, S.
The National Commercial Bank and Trust Company has filed its accounts as trustee in six separate trusts established pursuant to the provisions of paragraph numbered “ fifth” of the last will and testament of Elizabeth B. Mendleson which instrument was duly admitted to probate in Albany County on November 16, 1944. By the terms of the will, the residue of the testatrix’ estate was divided into six equal parts, each to constitute the corpus of a separate trust for different beneficiaries as appears in subparagraphs “ a ” through “ f ” in the afore-mentioned paragraph 11 fifth ”. The bank was the executor and in the decree of the Surrogate settling its account it was directed to turn over to itself as trustee in each of the six cases 2,550 shares of the common stock of B. T. Babbitt Co., hereinafter called Babbitt. Letters of trusteeship were issued on January 19, 1946 and the bank took possession of the stock in each case on March 15,1946. This stock was the only original corpus in each trust, there being no other assets in the estate to form part of the residue.
All of the named beneficiaries of the trusts, whether they be income beneficiaries or remaindermen, vested or contingent, are parties to this proceeding, with one exception. Ruth Mendleson, a secondary life beneficiary under the trust herein designated “c”, has died and her death prior to the primary life beneficiary eliminated her interests herein. Most of the *963 parties have multiple interests and for the purpose of clarity, it is deemed wise to recite those interests as they appear, trust by trust.
Trust “a”, Samuel Mendleson, primary life-income beneficiary ; Adéle Mendleson, secondary life-income beneficiary; vested remaindermen Betty Blatner, Alton Mendleson, Adele Sporborg, Ira Mendleson, Jr., Norman Mendleson.
Trust “ b ”, Alton Mendleson, primary life beneficiary; Doris Mendleson, secondary life-income beneficiaryvested remainder-men Alton P. Mendleson, Jr., Bibs Mendleson Weisberger and Toni Mendleson.
Trust “a”, primary life-income beneficiary, Ira Mendleson, Jr.; vested remaindermen Peter Mendleson, Ira Mendleson, III, and Adele Mendleson.
Trust ££d”, life-income beneficiary Adele Sporborg; vested remaindermen Harold Sporborg, Anthony Sporborg.
Trust “ e ”, primary life-income beneficiary Betty Blatner; vested remaindermen, Mary Elizabeth Blatner, Thomas Henry Blatner and Barbara Ann Blatner.
Trust “ f ”, primary life-income beneficiary, Norman Mendleson ; secondary life-income beneficiary Louise Mendleson; contingent remaindermen, Samuel Mendleson and Adele Sporborg.
Other interests than those above arise under circumstances herein set forth. The vested remaindermen in Trust£'£ a ” can be divested by their respective deaths prior to the life beneficiary. In that event, the remaindermen would be their issue and therefore the" following are contingent remaindermen in Trust ‘ ‘ a Mary Elizabeth Blatner, Thomas Henry Blatner, Barbara Ann Blatner, Harold Sporborg, Anthony Sporborg, Alton Mendlés’ón, Jr., Toni Mendleson, Bibs Mendleson Wéisberger, Ira Mendleson, III, Peter Mendleson, Adele Mendleson.
In Trust “ f ” those listed as contingent remaindermen take only after there is default of issue of the" primary life" beneficiary. Presently there is no issue. The probability of issue is remote but not the possibility. The primary income beneficiary has two adopted children, Joan Mendleson and Betty Mendleson, but the court has already decided preliminarily in this proceeding that they are not “ issue ” under the terms of the will. Betty Blatner, Ira Mendleson and Alton Mendléson, Alton Mendleson, Jr., and Bibs Mendleson have assigned their interests as contingent remaindermen to Betty Mendleson and Joan Mendleson, so that the adopted are by that reason contingent remaindermen. Ira Mendleson, III, Peter Mendleson, Adele Mendleson, Harold Sporborg, Anthony Sporborg, Thomas *964 Henry Blatner, Barbara Ann Blatner and Mary Elizabeth Blatner are contingent remaindermen in Trust “ f ” under the same circumstances that they reach that status in Trust “ a ”.
All six accountings are for all practical purposes identical. On the trial the petitioner’s proof ran to all accountings and while the objectants did separately call witnesses, all made use of each other’s proof and adopted it for their cases. There were some disavowals and requests not to be bound, particular in the case of infant parties. The court, in its decision, is taking all that into consideration and no party will be bound by the other’s conduct unless in law he must be so deemed to be. The fact that the objections, though separately filed, are repetitious and often identical and the afore-mentioned manner of the presentation of the proof constrained the court to the conclusion that all objections should be grouped and considered as applying to what is in effect one accounting. The court felt this was a fair and equitable course to follow in reaching the heart of a seemingly complicated controversy and did so proceed.
The petitioner here, in effect, is coming to court and setting forth for evaluation its conduct as trustee over an 18-year period. The acts of the trustee should be examined in the order of their occurrence. As the conduct unfolded itself, the court perused the objections to find those that applied to particular acts at particular times, and then determined from the record whether the particular objections should be sustained or rejected.
As in the case of any trust, the power and duties of the trustee here are those provided by law as limited or expanded by the terms of the instrument creating the trust. The court must discover and determine just where the petitioner stood when it assumed the mantle of fiduciary responsibility here if it is to justly appraise the merit or lack thereof in its subsequent actions. Paragraph “ sixth ” of the will read as follows: “ I hereby authorize and empower my executor hereinafter named as such, or as trustee to retain as part of my estate any securities forming part of my estate at my death, notwithstanding they may not be classified as trust investments under the laws of the State of New York and I hereby release and exonerate and discharge my executor as such, or as trustee from any and all liability and responsibility to my estate by reason of the retention of any such securities ’ ’.
Paragraph “ eighth ” reads as follows: “It is my special request that any and all shares of stock in B. T. Babbitt, Inc., of which I may be the owner at the time of my death * * * *965 shall be retained by my executor and trustee as principal of the trusts created herein and I request that none of the stock be sold or disposed of except in conjunction with the sale thereof of any members of my husband’s family unless a sale thereof is deemed for the best interests of my estate by my said executor or trustee
On the threshold here, there must be a determination as to what the trustee’s duty was and what powers it had to perform that duty. The answer is to be found not alone in the language of the testamentary instrument but the language therein must be construed in the light of surrounding circumstances. The Babbitt Company was a family endeavor ever since its beginning as A. Mendleson Company in 1870. At the time of the death of Elizabeth in 1944, the organization was controlled and run by the Jerome, Ira and Leon Mendleson families owning 80% of the stock. Ira was the husband of the testatrix, had died in 1931, Jerome, her brother-in-law, had died in 1940 and his son Alan was executive vice-president in 1944. Leon, her other brother-in-law was president. Alan and Samuel Mendleson, two sons of Elizabeth, were officers and directors in 1944. When the testatrix authorized the retention of the stock, coupling the authority with a request not to sell only in conjunction with members of her husband’s family, she gave the trustee the power to engage in the business and to enter into it in such a way that family control would continue. There was not here a mere naked power to retain securities but rather a mandate to keep up an interest in a business as such and with the same people who had always been in that business together. Great moment was made in the record of whether the securities were of the investment type or the speculative type with the thought of showing that at some time the trustee should have divested itself of the securities. Is not the real question here whether or not the trustee should have taken leave of the business as one no longer fit for trust money? Looking at the will, and the surrounding circumstances, that has to be the problem demanding solution. More detailed discussions of this will appear later.
The purpose of the trust is twofold and there are two classes of beneficiaries. A corpus is established for which income is to be produced for one group and upon death of members of this class, the corpus goes to designated remaindermen. The fund is to be preserved for the latter class, but in such a way as to produce income for the former. The trustee must so administer as to produce the best income consistent with a safe investment. If the money is being handled in such a way *966 as not to need this twofold purpose, there must be a change. This testatrix reminded the trustee of this duty when she stated there was to be no limitation on sale when it was for the best interest of her estate. Care must be taken by the trustee not to prefer one group of beneficiaries over the other. Gain for one cannot be had at the cost of loss to the other. Fair dealing requires equity for all and while the balancing of interests might be a problem, a determined effort must be made at all times to follow the middle course, else a breach of duty may result. All of the foregoing is to be kept in mind as the conduct of the accounting party is examined. (2 Scott, Trusts, § 183; Restatement, Trusts, §§ 183, 232; Matter of Coyle, 200 Misc. 421; Redfield v. Critchley, 252 App. Div. 568; Matter of Dwight, 204 Mis. 204.)
A word about the duty of a trustee generally. ‘ ‘ The just and true rule is, that the trustee is bound to employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs” (King v. Talbot, 40 N. Y. 76, 85-86). This general state of the law has been frequently approved. (Matter of Weston, 91 N. Y. 502, 511; Costello v. Costello, 209 N. Y. 252, 261.) To determine prudence “we are to look at facts as they exist at the time of their occurrence, not aided and enlightened by those that subsequently take place ”. (Purdy v. Lynch, 145 N. Y. 462, 475-476.) Hindsight has no place in the evaluation of a fiduciary’s conduct. Even the hopeless idiot has the matchless intelligence of the seer when he views the effects of an impending catastrophe after the same has happened. The statement appears in many eases that a trustee is not liable for a mere error in judgment. ‘1 Where he acts honestly and in good faith, and with reasonable prudence and discretion, he should not be held liable for unfortunate results which he could not be expected to forsee and was powerless to prevent ”, (Ormiston v. Olcott, 84 N. Y. 339, 347.) However, the line between negligence and mere error of judgment is often difficult to draw. If the trustee follows one course, and it turns out wrong, there is an error in judgment in every case. Strict attention should be given to the word “ mere ”. The trustee is not to be held to the responsibility of an infallible prophet or one gifted with an all-encompassing prescience. Yet if a prudent estimate of the present points out an uncertain future, the trustee must be held liable if his judgment as exercised brings down upon the cestui que trust disastrous effects. Prudence will sometimes dictate one course or the other. In such instances the trustee can 'select without
*967 risk. In other cases, prudence demands one course and one only. Failure to follow here means liability for the trustee. In the latter case he must be right or suffer. Matter of Pate (84 N. Y. S. 2d 853, 858, affd. 276 App. Div. 1008) presents the picture clearly: ££ The books are replete with surcharge cases, and the governing law is as simple as it is deeply rooted. Seemingly, therefore, the solution to the problems presented should be readily at hand. Yet, each case rests on its own peculiar facts. And the elements composing prudence are so human and imponderable, that there is no scientific or precise gauge for measuring it. Again, after the event, the line of distinction between negligence and mere error of judgment, and between lack of care and prevision, is not always clearly discernible ”. With this view of the law in mind, the court now approaches the instant situation.
Approaching the objections to the account in turn, disposition can be made of some without much discussion. First of all, many beneficiaries claim lack of diversification here as a breach of trust. That objection is overruled. The great weight of authority in this State is that diversification is not mandatory. (Matter of Beebe, 52 N. Y. S. 2d 736, affd. 268 App. Div. 1051; Matter of Young, 159 Misc. 611; Matter of Adrianee, 145 Misc. 345, 352.)
Some income beneficiaries now complain that the trustee paid out of income (1) the 1945 income tax, State and Federal (a) deficiency estate taxes, Federal and State (3) executor’s commissions (4) the special guardian’s fee on the accounting of the executor. The record shows that at the time of that accounting, the complaining income beneficiaries executed consents ‘£ waiving further payment of income to me as beneficiary under the last will and testament until all debts, taxes and expenses of administration have been paid or all moneys borrowed for such purpose have been repaid in full, with interest ”. The decree of accounting did provide that the commissions and special guardian allowance be paid out of principal and the will directed taxes to be paid out of principal. The decree further construed the will as giving the trustee, as well as the executor, power to borrow money to pay administration expenses and taxes. It further appears from the record the only asset of the estate at that time was the stock that is the corpus of the trusts. To pay from principal and prevent borrowing, the principal would have to be sold unless the income beneficiaries would agree otherwise. They did so agree and will not now be heard in opposition to that which was done pursuant to that agreement. The argument in the brief of *968 some of the beneficiaries that these consents went no further than the acts of the executor as such is not at all persuasive and the objections hence are overruled.
The record shows that $44,500, the proceeds of a loan for the payment of taxes, was properly charged to income because income was paying the taxes. The record further shows a tax rebate of $1,083.76 in each trust was properly attributed to principal since the original tax that was the basis for the rebate was paid out of principal.
In its accounts, the trustee declares the inventory value of the stocks in each trust to be $110,670 or $43.40 a share on the basis of 2,550 shares and the value was the same that appeared as inventory value in the executor’s account as judiciary settled and allowed on December 31, 1944 and it was the same value that was used in the original estate tax return both Federal and New York State. The date of death was October 5, 1944. All the parties to this proceeding or their predecessors in interest were parties in the executor’s accounting. The trustee here in setting up the inventory value of each trust apparently adopted its own figures as executor. The objectants assail this figure as too low for March 15, 1946, yet no attack was made on it in the executor’s proceeding. Under the circumstances of this case the burden was on the objectants to prove a different value. No independent affirmative proof of value was introduced by them and their contentions rest on the following elements in the record: 1. The Internal Revenue Service fixed the value of this company’s stock as of October 19,1946 at $13.30 a share (after the 12 for 1 split). 2. The stock sold on the public market for $15.90 a share net (after the 12 for 1 split) on January 29, 1947. 3. The trustee here consented sometime subsequent to the executor’s accounting to a tax valuation of $65 a share ($5,416 after the 12 to 1 split) and a Federal and State deficiency assessment was paid by the trustee in July, 1947.
The nude fact of the October 19 valuation does not automatically tie itself into the valuation of March 15, 1946. The record has not been developed to show the elements that went into the October 19 valuation and as to whether those same elements were in existence on March 15, 1946 the record is likewise silent. A determination that the October 19 value and the March 15 value are the same would be simply forbidden speculation.
As to the market value of January 29, reference cannot be made back as the stock was not on the market prior to that time and the gauge of public acceptance cannot be used to cover *969 a period when in fact the public was not offered the stock. To conclude the public acceptance would be the same is again forbidden conjecture.
When we come to the new tax value established subsequent to the executor’s accounting, there are different considerations. The spirit of compromise may have surrounded the trustee ’-s dealing with the Internal Revenue and the trustee may have been motivated by a desire to save money by consenting, believing that to allow a Government determination in the face of opposition would mean more tax, nevertheless the new value, with its attendant increased tax burden, was visited upon the estate by the trustee. From that point onward, the value of this inventory was the tax value (or $5.416 a share after the 12 to 1 split). Having so acted in the setting of the value, its future duty to protect the corpus of this trust began at the tax value. The conclusion that there must only be protection as to $3.616, when the protector itself burdened the estate with a $5.416 value does not square with common sense. Assuming the trustee was correct in establishing this last-mentioned amount at the outset, the picture changed by virtue of the trustee’s conduct and the court must keep that in mind in viewing and appraising the prudence of the actions of the accounting party.
There is proof in the record that B. T. Babbitt, Inc. purchased on September 16, 1946, 6,000 share at $20.83 a share. The record further -shows that as part of the consideration for the money received the purchaser executed a release of a certain claim or lawsuit against the corporation. The facts (a) that the sale occurred some six months after March 15, 1946 (b) that it was not an unadulterated transfer of stock for money indicates to the court the price received is not a basis for determining inventory value.
Up to this point, specific objections have been considered and rulings made thereon. Grouping all of the remaining contentions of all objectants, the court reaches the conclusion that the one main accusation against the trustee is that it retained this stock when it should have sold the same and that by virtue of said retention beneficiaries have been damaged. On March 16, 1946 thi-s stock was favorably put into the trust and in May, 1964 it was sold by the trustee. Was the trustee under a duty to sell at any time prior to the actual sale? If so, when was the time ? What damage has there been to the beneficiaries because of the breach of duty, if so found? The answers to these interrogatories provide the solution to the problem before the court and the best avenue of approach to those answers is a chronological examination of the bank’s conduct from begin *970 ning to end. Appropriate here is a statement gleaned from Matter of Pate (84 N. Y. S. 2d 853, 858, supra): ‘1 What is more, the trustee’s conduct is not to he judged from the vantage point of hindsight; instead, it must be considered prospectively — the flashback method must be employed, unaided or enlightened by subsequent events ’ ’.
G-reat moment has been made of the point whether or not this ■stock is speculative type or an investment type. The objectants ’ expert testified that it was speculative in January, 1947, while the petitioner’s expert stated that it was of the investment type in 1947, but became speculative perhaps in 1949, certainly in 1950. All of this would be fine except as the court views this ease, the controlling point has been missed. This testatrix was not a mere ordinary stockholder in any corporation, but as such a stockholder held such an interest in a family business as to allow her to actively participate in management and control. In directing her trustee to continue to hold the stock she in effect wanted her role to be kept going, her money to be kept not so much in the security as in the business and its actual running. The duty of the trustee here was not so much to watch the market but the business itself. The court does not want to say that market experts could not give some aid here but evaluations of the business itself by qualified people would have been more germane. It is not so much as what the market price of the stock is but rather what is the business, as actually operated, doing for the trust purposes. As long as participation in the business served the purposes of the trust, as hereinbefore outlined, the trustee could stay. When it failed to do just that, the trustee had to pull stakes.
On January 29, 1947, the trustee sold on the open market 4,590 shares from each of the said trusts at a net price of $15.90 a share. The main objection surrounding this sale is that inasmuch as the market value was three times that of the inventory value, all of the stock should have been sold to realize the high profit. There can be no doubt that such a sale would have enhanced the principal of the estate and served well the interests of the remaindermen. But what about the income beneficiaries? Sale of the entire block of stock would have brought $483,540 with a cost of $165,546 bringing about a $317,994 profit with a capital gains tax on $158,997. Assuming a tax of $50,000, $433,540 would be left for investment in legáis. At 5% (a liberal return) the annual yield would have been $21,677. The record here shows the stock paid $31,492 in 1946 and the first dividend of 1947, just prior to the sale, was $2,800 in excess of the first two dividends in 1946 and 1946 *971 dividends were substantially larger than those in 1945. Further reading of the exhibits here show that the trustee could believe the company was prospering, dividends were increasing annually even on a market value that had soared well over inventory value. The judgment not to sell to reap the profit could be deemed prudent in that retention was the equitable way to serve all beneficiaries. It is true that subsequent events brought a decrease in both market value and dividends, yet the status of the matter in January, 1947 did not indicate the future course of things to be such that the trustee had a duty then and there to provide for it. It cannot be charged with failing to prevent what it was powerless to foresee. When it comes to peering ahead, prophetic omniscience is not demanded of the fiduciary. Prudent judgment as to the present is sufficient and was so here. The trustee had no duty to sell, and if there were dire consequences because of retention in 1947, liability does not fall upon the petitioner therefor.
One objectant states that decision to sell a portion was an indication that the trustee knew it was proper to sell all. There is a non sequitur here. The trustee could well have decided that it was a wise business move to obtain public financing (the trustee certainly had the right to function in the management of Babbitt), yet at the same time maintain family control, by retention of a controlling block. If the trustee had the right to sell some, it does not have the right much less the duty to sell all. No one here is assailing the partial sale and it stands justified. The retention stands on its own feet, right or wrong.
Other objectants claim there should have been a total sale because (a) the stock was speculative, (b) the trustee failed to make an independent decision to retain the stock and relied solely on the will, (c) a sale would have been in accord with the wishes of the testatrix because 11 the special circumstances ” sale for best interest of her estate then existed. As for the speculative nature of the stock, this trustee had the right to retain it in the first instance and for as long a period as it served the purposes of the trust. Labeling of the security as speculative or investment type seems unimportant. This trustee made the judgment in January, 1947, the stock was serving the purpose and as hereinbefore set forth there is no demonstration of a lack of prudence in connection with that judgment. As for what was in the trustee’s mind, either the will or independent thoughts, matters little. The examination is of what it did — retention. The argument that a sale would have met the desires of the testatrix must fail, for there cannot be laid to her an intention to prefer one group of beneficiaries over *972 another. ¡She showed no intention directly contrary by establishing the trusts in the manner she did.
Having seen that retention as of January 29, 1947 was not assailable as a breach of duty, the court moves forward in time with it’s eyes ever on the trustee’s conduct. In the year 1947, the dividend rate was $1.30 per share and even on the reduced number of shares after the sale, each trust received $35,000, an increase of $4,000 over 1946. Market value fell some but the rate of income on that value remained in excess of what legáis would bring. In 1948, 1949 and 1950, the return was $1.20 a share or $31,000 to each trust. In March, 1950 market value was 14, the same as it had been in February, 1948 and the rate of return was still in excess of legáis. However, following the summaries of the trust department of the bank, changes began to occur in early 1950. March, 1950 earnings were 13 cents under March, 1949. April, 1950 earnings were 1 cent per share compared to 9 cents in March, 4 cents in February and 22 cents in January. November, 1951 earnings showed a red figure before computation of the amount available for common shares. The dividend was reduced from 30 cents to 15 cents a quarter (this is summary dated January 4, 1951). A bank summary of March 15, 1951 showed the market value down to 12, the quarterly dividend down to 15 cents from 30 cents. 1950 earnings were pegged at 88 cents a share compared to $1.35 in 1949. At this time the bank recognized ‘ ‘ competition has increased tremendously but merchandising policies are aggressive profit margins in the immediate future will continue under pressure until heavy promotional expenses of new products has been eliminated”. A bank summary dated January 16, 1952 showed the market value to be 9, compared to 12 of March, 1951 and 14 of March, 1950. Earnings were 75 cents a share compared to 88 cents in 1950 and $1.35 in 1949. The report stated “ Competition has increased tremendously and profit margins will continue under pressure until heavy advertising expenses caused by severe competition, have been lightened.” The bank records of meeting of May 29, 1952 show less than 1 cent for April earnings and 26 cents a share less for first four months of 1951 compared to 1950. June 9, 1952 meeting record shows dividend rate cut from 15 cents to 5 cents. Later it was discovered five-month earnings of 18 cents compared to 53 cents in 1951.
A summary prepared by the trust department of the bank for the trust investment committee dated September 16, 1952 showed the following (a) market value — $6, (b) first six months 1952 earnings at 16 cents compared to 60 cents in 1951, (c) first *973 three dividends yielded 45 cents in 1951, 35 cents in 1952 with the last one at 5 cents. The trust investment committee met on September 23, 1962 and said ‘ ‘ no accounting recommended because of little change in investments ”. Apparently the committee then decided to retain the stock. To justify that action, the trustee had to be entitled to draw the conclusion this business was still one fit for the use of trust money. What did the bank lmow about the business at this time? The bank knew that at least since 1948 and continuing up to September, 1952 competition in the field of household cleansers had increased. Where Babbitt had once led the field, it was now running with the pack and sacrificing profits to keep up the pace. The company reports from 1948 on indicate a heavy burden of advertising expense to eliminate the competition and in spite of these efforts, it remained deep-seated. Market value, earnings and dividend payments were going one way — down. The September 16 summary indicated an estimated annual return of $10,000 per trust, which might mean a high return on market value of $6. However, as of the date of that summary, the rate of return was 20 cents a share annually or $5,202 and that figure was less than 4% on the then market value of $6. The return was now reaching or had reached a point where legáis would have brought more. Could this trustee leave these trust funds in what was once a flourishing business enterprise but was now one that had faltered and was in need of rehabilitation and reconstruction? At this point the trustee had to keep foremost in its mind the purpose of the trust, to wit, an adequate income commensurate with a safe investment. The trustee states in its brief that the law is that a prudent trustee is not liable for a decline in value and cites Matter of Clark (257 N. Y. 132). It cannot be gainsaid that the Clark case is the authority on the subject and properly sets forth the rule. The whole subject of prudence has been heretofore discussed in this opinion and despite the bank’s claim it was prudent, this court must examine further. There was, indeed, no supine negligence here. The bank constantly studied the situation here and reviewed it methodically and in some detail at all times. This alone does not make it prudent. Before judgment is passed as to prudence or the lack thereof, the court must examine what the bank did or did not do as the result of its considerations. As this court reads the Clark case, there was something in that record that would have justified the sale or retention of the subject stock and hence the trustee’s act was determined a mere error of judgment. Is there something in this record that can save the trustee from liability? The trustee is apparently of that mind *974 and now the court will dwell upon the arguments advanced by the trustee to justify its continual retention of the stock.
First of all, if the prudent thing to do was sell, failure to sell was a breach of duty. However, it stands to reason that one charged with a duty cannot be held derelict therein if there be impossibility of performance. A trustee is not under a duty to the beneficiary to comply or attempt to comply with the terms of a trust requiring him to do an act the performance of which is impossible or reasonably appears to be impossible and he is under a duty not to attempt to comply with a duty requiring him to do an act the performance of which is impossible if the trustee knows or should know it is impossible or if the trustee should realize the expense in attempting to comply is unreasonable (Restatement, Trusts, § 165; 2 Scott, Trusts, § 165). It would seem that under this rule the trustee’s belief of impossibility is not sufficient to excuse but the belief must be reasonable. The bank argues that in its judgment a public sale of the stock would have been impossible and that it is therefore free from blame in not having attempted the same. The stock had to be registered under the Securities Exchange Act of 1933 (U. S. Code, tit. 15, § 78a seq.) with the Securities Exchange Commission so that all relevant facts about the company, the stock and the stockholders could be brought to the attention of the buying public. The public and any prospective underwriter would come to know it was management stock and that the sale was for the benefit of the selling stockholders. The trustee has submitted expert proof that there could be no underwriting of this stock in the event of a public sale because it was a “management sale” and one of the type potential underwriters look at with “a suspicious eye”, fearing 11 bail out ’ ’. The expert further testified that a sale here would be a second one for the management element and would bring management holdings below an acceptable level. The expert said there could have been no underwriting after 1947. The objectants presented an expert who stated the possibility of an underwriting in 1958 or 1959 but the impossibility of an underwriting at any other time was left unchallenged, The objectants’ expert never reached the “management” feature except inferentially by reference to the 1958 underwriting. The trustee offered no evidence it at any time tried to obtain an underwriting in 1952, but rested on its own judgment one was impossible. From the proof here adduced it had the right to make that judgment. Having so reasoned could it go further and conclude that minus an underwriting a successful public sale would fail. The registration statement in 1952 would have *975 revealed the company’s declining position and would have shown management stock being sold. A public sale through brokers on the exchanges or over the counter could possibly fail and thus harm the holdings by virtue of a depressed market. This attempted public sale would involve the substantial expense connected with registration. The determination that the trustee says it made here not to sell because of anticipated failure was a reasonable one within the rules of conduct set forth at the outset of this paragraph and the court finds that failure to pursue the public sale was not a breach of duty.
Excused as it may have been from offering the stock to the public the bank must further justify retention. Part of its judgment not to sell publicly was that a private sale or merger was the best means of disposal. It is the opinion of the court that commencing in September, 1952 this trustee had the absolute duty to seek out means of effecting a private sale or merger in order to place these trust funds in a proper investment. There is a stipulation in the record that the bank conducted negotiations for such a sale from 1952 until 1964 and that an ultimate sale came at the end. However, the question here is 11 did the trustee perform its duties in connection with a private sale? ” The record does not show that the trustee commenced in September, 1952 to seek out a possible private buyer or a person interested in merger. A stipulation proves the bank negotiated with Consolidated Grocers, Inc. and Wolcott Company, Hartford, Conn, in 1952-1953. Just when these were had does not appear, nor is the nature or extent of them apparent. The correspondence file of the trust officer of the bank, admitted into evidence, offers no further enlightenment on this subject. The bank could not wait for buyers to come in but had to seek them out. If it sought and failed to find, it would be not liable. If it found and unsuccessfully negotiated in good faith, then likewise it would not be answerable for the failure of sale. The file of the bank trust officer shows a credit inquiry about Wolcott in September of 1953 (letter of Sept. 21, 1953 to trustee) and the receipt of credit reports (in file). On February 3, 1954, the bank received in reply to an inquiry an opinion from Moody’s Investor’s Service on Purex, Inc. The bank on February 17, 1954 made further inquiry on the same group, having sought the aid of the Bank of America in California. This same file shows Lehman Brothers had, on behalf of B. T. Babbitt, been a party to preliminary discussions of merger or consolidation of the two companies. Evidence of this is a report of said Lehman Brothers, dated January 29, 1954 in the trustee’s file. The report predated the bank’s inquiry about Purex and indicates Babbitt *976 was the party looking to merger, not the trustee. The file is silent as to any actual negotiations at least up until the end of 1954. File shows further papers relating to a 1957 dealing re: Purex. The testimony as elicited from the witnesses Jones and McCabe tells nothing further prior to 1955 and McCabe’s file (in evidence) is likewise silent. From the testimony, the files in the record and the stipulation, there were negotiations from 1956 to 1964 with several companies, some dealings being quite detailed, prolonged yet unproductive. The bulk seem to come in 1962 and thereafter. The question arises “Why no companies following the September, 1952 meeting? ” It cannot be assumed they were not available absent a showing of a futile search for the same. What followed the credit inquiry about Wolcott? What was actually done with Consolidated Grocers, Inc.? It is quite clear that the bank had the duty to sell by private sale within a reasonable time after September 23, 1952. Nothing that could approach a reasonable effort appears before 1956. Four years is simply too long to wait. The reasonable time began to run in September, 1952 and it is difficult to say, in its absence of some showing by the bank of an effort to effectuate a sale to say when it ended. Having failed to perform, the trustee stands liable and the cestui que trust must be put into the same position that performance would have brought. The court finds that July 1, 1953 is the day of default.
Before getting to the question of damages, there must be examined the contention of the bank that there was ratification and estoppel for all acts of the trustee up to and including December 31, 1954. First of all, the infant remaindermen here could not ratify nor could they be declared estopped. Those infants whose interest arise out of assignment from certain adult parties are in no better position than their assignors and if the assignors be bound, they will likewise be bound. To successfully assert that any of the beneficiaries are estopped from questioning the retention of the stock in 1952, the petitioner must show that any, some or all of the beneficiaries, did by their commissions or omissions, induce the petitioner to so act so that they now cannot be heard to complain of the results of that action. The record here is barren of any proof of any conduct of the beneficiaries along this line. Nothing can be made of their failure to speak or to act, for there was no duty to do that. The principle of injuria non est volenti is not applicable.
There being no pure equitable estoppel here, the question arises whether or not the same result can obtain because of
*977 ratification or waiver. The only point at which ratification or waiver could arise here is at the time of the proposed accounting in 1955. Upon the basis of the testimony adduced only Alton Mendleson, Ira Mendleson, Adele Sporborg and Betty Blatner would possibly be brought within the orbit of the operation of the doctrine. The rule on ratification in this State is expressed as follows in Matter of Ryan (291 N. Y. 376, 417). Quoting Adair v. Brimmer (74 N. Y. 539) the court said: “‘To establish a ratification by a cestui que trust, the fact must not only be clearly proved, but it must be shown that the ratification was made with full knowledge of all its material particulars and circumstances, and also in a case like the present that the cestui que trust was fully apprised of the effect of the acts ratified, and of his or her legal rights in the matter. Confirmation and ratification imply to legal minds, knowledge of a defect in the act to be confirmed, and of the right to reject or ratify it. The cestui que trust must therefore not only have been acquainted with the facts, but apprised of the law, how these facts would be dealt with by a court of equity. All this implied in the act of ratification, when set up in equity by a trustee against his cestui que trust, must be proved, and will not be assumed. The maxim “ ignorantia legis excusat neminem,” cannot be invoked in such a case.’ ” The record in the instant ease does not permit this court to say there has been a compliance with this rule and therefore it is held that there was no ratification. Ratification means that one under no disability voluntarily adopts and gives sanction to some unauthorized act which without such sanction, would not be binding upon him. Such sanction must be deemed given only within the confines of the quoted rule and it is not deemed given in this case.
A waiver is a voluntary and intentional relinquishment of a known legal right (Alsens Amer. Portland Cement Works v. Degnon Contr. Co., 222 N. Y. 34, 37). The beneficiaries here had a right in 1955 to demand an accounting and to question the acts of this trustee as it accounted. Can it be said that, considering the acts of the trustee and the cestui que trust surrounding the proposed accounting in 1955, that said cestui que trust voluntarily and intentionally relinquished his or their rights? The trustee has not made it clear in this record that the cestui que trust was fully aware of his rights and he cannot be deemed to waive that which he did not know he had. (Werking v. Amity Estates, 2 N Y 2d 43; Matter of Graham, 39 Misc. 226.) The abandonment must be deliberate and informed (Matter of Miller, 162 Misc. 563). In the instant case, it was never proved the beneficiaries saw the proposed accounting, *978 but only a short summary thereof. Knowledge of the nature and extent of the accounting was never brought home to them. They never did execute proposed waivers of citation on the accounting. They did apparently tell the bank that they saw no need for an accounting at this time, but there Was some doubt raised as to whether it was an accounting or an audit. This court cannot find their acts so free of equivocation and so fully informed as to constitute a waiver and the court holds that there was no waiver here.
Having failed to sell the trust property, trustee is chargeable with the amount which would have been received if the property had actually been sold, together with interest thereon. (Restatement, Trusts, § 209; 2 Scott, Trusts, § 209.) (Matter of Garvin, 256 N. Y. 518; Matter of Hamersley, 180 N. Y. S. 887; Willard v. Willard, 219 N. Y. 482; Matter of Baker, 249 App. Div. 265; Matter of Frame, 245 App. Div. 675.) The court further is of the mind that this is one of those cases where market value is rather difficult to determine and also, said market value would not be the completely controlling factor in the required sale. The sale value of the stock is found to be the inventory value thereof or $5,416 a share.
The sale of the stock in each trust should have netted $141,032. The interest on that amount from July 1,1953 to July 1,1964, at 4% is $62,054.08. As a credit against this amount, the trustee is allowed the sum of $39,405, together with interest thereon at 4% from May 4, 1964 to July 1, 1964, making a total of $39,654.56. Further credit to the trustee is allowed in the sum of $38,218, being the amount of Babbitt dividends received for the trust from July 1, 1953 to July 1, 1964. The Kardon contract is to become the property of the trustee and all further payments thereunder or forfeiture thereunder shall be the property of the' trustee. The net surcharge against the trustee is $125,214 in each trust, with $101,378 payable to the principal account and $23,836 payable to the income account. The Kardon contract is worth $78,810 in each trust, together with varying interest.
Surcharge and the denial of commissions are not inextricably interwoven. The cases on the subject indicate that the matter of refusing commissions, even in surcharge cases, rests with the discretion of the Surrogate. A studied reading of this record constrains this court to the conclusion that there is no fraud here, no gross neglect of duty, no intentional harm to the trust or sheer indifference to the rights of others or disloyalty as would, in addition to answerability, call for punishment of the fiduciary. The trustee found itself in a rather difficult position, *979 and while it must respond in damages for having made the wrong judgment, the denial of commissions would he the imposition of an unwarranted penalty. The retention of commissions by the trustee is left undisturbed,
Costs being discretionary, there will be none to any parties. Allowances of the special guardians will be fixed at the time of the submission of the decree.