Dr. William H. WITHERS, Dr. Dorothy N. Naiman, Dr. Mark W. Zemansky, Plaintiffs,

v.

TEACHERS' RETIREMENT SYSTEM OF the CITY OF NEW YORK, Robert Christen, Victor F. Condello, Bernard Goldberg, Harrison J. Goldin, Reuben W. Mitchell, James F. Regan, Joseph Shannon, Defendants,

and

United States of America, Intervenor-Defendant.

No. 76 Civ. 4474 (WCC).

United States District Court, S. D. New York.

March 9, 1978.

Kaplan, Kilsheimer & Foley, New York City, Kohn, Milstein & Cohen, Washington, D. C., for plaintiffs; Michael D. Hausfeld, Washington, D. C., Robert N. Kaplan, New York City, Herbert E. Milstein, Harold E. Kohn, Washington, D. C., of counsel.

Allen G. Schwartz, Corp. Counsel, New York City, for defendants; James G. Greilsheimer, Judith A. Levitt, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for intervenor-defendant United States of America; Kent T. Stauffer, Asst. U. S. Atty., New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

In November 1975, the Teachers' Retirement System of the City of New York (the "TRS") and four other municipal pension funds [1] agreed to purchase New York City bonds in the principal amount of $2.53 billion over a period of approximately two and a half years as part of a financial plan to stave off the City's potential bankruptcy. The TRS, by authorization of its Board of Trustees, committed $860 million of its retirement fund assets to the purchase. Claiming that the action of the trustees constituted a breach of their fiduciary obligation to the retired beneficiaries of the fund, plaintiffs seek damages and injunctive relief prohibiting the further investment of TRS assets in securities or obligations of the City of New York. Plaintiffs further pray for a declaration of the unconstitutionality of certain state and federal legislation, the enactment of which was made a pre-condition to the pension funds' participation in the November 26 plan of financial recovery.

The named plaintiffs are retired teachers formerly employed by the Board of Higher Education of the City of New York. Each is a member of and receives a "retirement allowance" (consisting of a pension and annuity) from the TRS. The basis of the Court's subject-matter jurisdiction is diversity of citizenship. In December 1976, the Court denied plaintiffs' motion for a preliminary injunction, and the case later proceeded to trial without a jury. This opinion constitutes the Court's findings of fact and conclusions of law.

The TRS was established in 1917 as an actuarially reserved pension system. As such, the funds that would be necessary to provide the lifetime pensions and annuities of the members of the System were to be contributed throughout the years of the members' active service by the City of New York as employer and by the members on their own account. The contributions of the City fund the retirees' "pensions" and are held in one of the System's four component funds—the Contingent Reserve Fund—until the date of retirement is reached. The members' own contributions fund the "annuity" portion of their retirement allowances and are held in the Annuity Savings Fund. When a member retires, the sum necessary to support his pension is transferred, on the books of the System, from the Contingent Reserve Fund to the Pension Reserve Fund No. 1 and, similarly, the amount necessary to support his annuity is transferred from the Annuity Savings Fund to the Annuity Reserve Fund. These transfers are purely bookkeeping entries, however, and no physical transfer of funds actually occurs.

The level of the City's annual contribution to the retirement fund is determined by the actuary of the TRS pursuant to statute. N.Y.City Admin.Code § B20–26.0. See also, "Pensions: A Report of the Mayor's Management Advisory Board" (the

---

1. The New York City Employees' Retirement System, the Board of Education Retirement System for the City of New York, the New York City Fire Department Pension Fund and the New York City Police Pension Fund.

"Shinn Report") at 1–2; Fifty-Eighth Annual Report of the Retirement Board for the Fiscal Year 1974–1975 at 69. In essence, the actuary estimates the present value of the benefits that the pension plan will pay in the future and allocates their cost on an annual basis to the active working lifetime of plan participants. In theory, therefore, the System is meant to be a "fully funded" one, that is, as explained at trial by Jonathan Schwartz, the chief actuary of the City's five retirement systems, one with sufficient assets on hand to cover the accrued "past service" liability to all active members and also to guarantee benefits for life to those presently on the pension rolls. As of June 30, 1974, the TRS's liability for retired members was $1,615 million, and its accrued liability for active members, $3,008 million.

In actual practice, however, this liability is far from fully funded. The primary reason is that additional past service liabilities were created in 1970 when the New York State Legislature substantially increased the level of retirement benefits for the System.

The cash contributions from the City constitute by far the most significant source of TRS income, substantially outweighing income from employee contributions and invested plan assets. For the fiscal years ending June 30, 1974 and June 30, 1975, the City's annual cash contribution constituted 62 percent of total income.[2]

The exclusive management and control of the several "funds" of the TRS is vested in a Board of Trustees. N.Y.City Admin.Code § B20–31.0. The seven-member Board consists of the President of the Board of Education (or his designate), the Comptroller, two mayoral appointees and three members of the retirement association elected from the contributors (the teacher-trustees). At trial, the parties called as witnesses two of the trustees who had served on the Board of the TRS at the time of the negotiation

and signing of the November 26 Agreement—the third deputy Comptroller, William Scott, and one of the teacher-trustees, Joseph Shannon. In addition, depositions of the two remaining teacher-trustees, Reuben Mitchell and Bernard Goldberg, were submitted in evidence.

Each of the trustees stated that it was the threat of the City's imminent bankruptcy that accounted for his affirmative vote on the question whether to purchase the City's bonds under the terms of the November 1975 Agreement. The trustees had received recurring reports throughout the summer and fall of 1975, in meetings with City, State and Municipal Assistance Corporation ("MAC") officials, of the deteriorating state of the City's finances, in connection with purchases of MAC bonds on behalf of the TRS. These purchases, staggered over the months of August, September and October 1975, totalled $275 million. The trustees had been informed that these purchases were necessary if the City was to avoid bankruptcy.

In the early part of November 1975, concerned about the City's ability to continue its annual cash contributions to the TRS, the teacher-trustees initiated meetings with MAC officials and Jack Bigel of Program Planners, Inc., consultant to several of the City's unions, to review long-range plans that were being developed to meet the City's fiscal crisis. They reviewed figures on the income needs and projected income of the City and on the current and projected levels of the City's annual contributions to the TRS. There were also frequent meetings among the trustees and the New York City Comptroller and Corporation Counsel, to discuss the projected short-falls in the City's budget and the need for long-term financial assistance.

In mid-November, Goldberg obtained from the office of the Comptroller a draft of the proposed three-year plan for the financial recovery of the City. He studied

---

**2.** For the fiscal year ending June 30, 1974, employee contributions constituted 9 percent of total income and investment income, 29 percent. For the fiscal year ending June 30, 1975, employee contributions constituted 7 percent of total income and investment income, 31 percent.

the plan with his fellow teacher-trustees and consulted with Jack Bigel. On or about November 24, 1975, the trustees were formally asked in a meeting called by the Mayor at City Hall to subscribe to the plan. They were told by officials of MAC (Felix G. Rohatyn, George D. Gould and Herbert Elish) and by the third-deputy Comptroller, William Scott, that, without the pension funds' participation in the plan, the City would go into bankruptcy. Scott, who was then serving on a "contingency committee" concerned with the threat of the City's bankruptcy, testified at trial that had the plan not been adopted, the City would have had to default on its obligations on December 11, 1975 or shortly thereafter.

The predominant concern of the trustees was the effect that a bankrupt City would have on the solvency of their own retirement fund. In their testimony, the trustees acknowledged that it would have been impossible for them to predict with certainty how City funds would be allocated in bankruptcy. Their considered judgment at the time, however, was that essential services and bondholders would have a prior claim to the City's funds and that the City's annual payments to the TRS would cease. The conclusion of Scott's contingency committee, which was passed on to the trustees, was that there would not be sufficient cash flow for the City to be able to continue its contributions to the pension funds in bankruptcy and that City funds would rather have to be devoted to those services immediately necessary to the health and welfare of the City, including hospitals and the Police and Fire Departments. The office of the Corporation Counsel advised similarly.

In the absence of City contributions, and if the TRS continued to pay full benefits to current and future retirees as they fell due, Schwartz calculated that it would be immediately necessary to invade capital and that the reserves of the TRS would then be depleted in 8 to 10 years,[3] even if there were a continuation of employee contributions and a relatively constant rate of retirement.[4] Schwartz advised several of the trustees individually of his calculations prior to their entering into the November 26 Agreement.[5]

The trustees were unanimously of the view that their fiduciary obligation was to safeguard the interests of all of the members of the TRS—those still in active service and therefore dependent upon the long-term viability of the fund for their retirement incomes, as well as those already retired. Their major concern, therefore, was to prevent the depletion of the assets of the System by protecting what was, according to the information available to them, the major and indispensable source of the TRS's funding—the City of New York. Scott emphasized in his testimony that the trustees went to great lengths to satisfy themselves of the absence of any reasonable possibility that the City would be able to obtain the needed money from other sources. Only when they were convinced that the pension funds were the lenders of last resort did they authorize the investment in City bonds.[6]

In the tense November 24 meeting at City Hall, the trustees were informed that the other retirement systems had already approved the proposed Agreement. Their own approval was urgently sought. Despite pressure from the Governor's office and from City Hall, however, the teacher-trustees voted initially to reject the Agreement. They insisted first upon the incorpo-

---

**3.** Schwartz characterized his own estimation as conservative and testified that other actuaries had calculated that, in the absence of City funds, the reserves of the TRS would be depleted in 5 to 7 years.

**4.** Schwartz was in fact of the view that the rate of retirement would increase in the event of bankruptcy.

**5.** In addition, prior to trial, Schwartz determined that, as of June 30, 1975, 16,000 (out of approximately 25,000) retirees had life expectancies in excess of 10 years and thus had a stake in the continuation of City contributions to the fund.

**6.** To accomplish the purpose of keeping the City afloat, the bonds were purchased at par value directly from the City, rather than at a discount in the market.

ration of a number of provisions that, in their view, were necessary to secure the maximum protection for the beneficiaries of the TRS. For several reasons, the trustees' inclination was to accept the Agreement if their conditions were met. Primarily, they reasoned that if they committed the $860 million of TRS funds to the purchase of City or MAC bonds, this amount would be approximately equal to the amount that the City would contribute to their System during the 2½-year period to follow. The TRS thus could be no worse off under the plan than it would be in bankruptcy without City funds. Moreover, the plan provided the prospect that the City would remain a viable institution and that the bonds, backed by the full faith and credit of the City and yielding 9-percent interest annually, would be paid when due.

To insure, however, that their participation in the plan would not be a futile gesture, with bankruptcy to follow nonetheless, the trustees obtained a provision conditioning the pension funds' investment in the City bonds on the enactment of federal legislation providing for the seasonal financing needs of the City for the 2½-year period of the Agreement.[7] They further conditioned the investments on the passage of state legislation concerning the legal status of the pension funds and the responsibilities of the trustees. The legislation, enacted as Chapter 890 of the Laws of New York of 1975, effective December 5, 1975, contained provisions (1) authorizing the City pension funds to purchase City or MAC obligations without regard to the percentage of the assets of the fund invested therein; (2) authorizing the trustees of the funds to consider, "in addition to other appropriate factors recognized by law," the extent to which their investments in such obligations would

"(a) maintain the ability of the city of New York (1) to make future contributions to such systems and funds and (2) to satisfy its future obligations to pay pension and retirement benefits to members

and beneficiaries of such systems and funds and (b) protect the sources of funds to provide retirement benefits for members and beneficiaries of such systems and funds."

(3) making the City of New York the indemnitor of the trustees for losses arising out of claims for alleged negligence, waste or breach of fiduciary duty resulting from the purchase of City or MAC obligations or the sale of any assets of the fund to produce sufficient revenues for such purchase; (4) making the payment of pension benefits an essential service; and (5) immunizing the funds of the retirement systems from the claims of the general creditors of the City.

Before voting their approval of the Agreement, the trustees also negotiated the reduction of the TRS's commitment from $1 billion to $860 million so that, in respect to the other retirement systems, the TRS would not be obligated for more than its proportionate share.

Additionally, they demanded and received a commitment from Governor Carey that legislation would be introduced providing that income earned on TRS assets in excess of 4 percent, which was then credited to the City pursuant to N.Y.City Admin.Code § B20–30.0(b)(2), would be utilized first to accelerate the amortization of capital losses incurred in the sale of securities, and, second, to accelerate the payment of unfunded past service liabilities. The trustees felt that the legislation would substantially strengthen the funding of the System.

A final condition, in the draft of the Agreement as originally presented to the trustees, was that the Internal Revenue Service issue a ruling, or Congress enact legislation, providing that the purchases of the City obligations would not jeopardize the tax-exempt status of the pension systems.

On November 25, 1975, in a meeting in the Governor's office in New York City, the

---

**7.** The New York City Seasonal Financing Act of 1975, Public Law 94–143, is codified at 31 U.S.C. § 1501 *et seq.*

teacher-trustees voted to approve the Agreement in its revised form. The Agreement left the pension funds the option of purchasing either City or MAC bonds. Prior to the date of their first scheduled purchase, the trustees concluded that the City bonds, backed by the pledge of full faith and credit, were a safer investment than the MAC bonds then available. To date, the TRS, and apparently the other municipal pension funds as well, have purchased solely City bonds pursuant to the terms of the November 26 Agreement.

\* \* \* \* \* \*

Plaintiffs contend that defendants violated their fiduciary duty to the beneficiaries of the TRS in purchasing unmarketable and highly speculative City bonds; in making their investment decision with the objective of rescuing the City, rather than enhancing the soundness of the fund; in relying on "highly speculative" reports that the City faced imminent bankruptcy and that bankruptcy would result in a cessation of the City's contributions to the TRS; and in acting under the compulsion of City, State and MAC officials, rather than of their own free will in deciding to enter into the November 26 Agreement. Plaintiffs further assert that the paramount obligation of defendants as trustees of the TRS was to the retired rather than to the active members of the System and that defendants disregarded that obligation in this case. Plaintiffs' claim is that these breaches of fiduciary obligation have resulted in a reduction of the value of the assets reserved for the exclusive benefit of the retirees and that they are therefore entitled to damages and injunctive relief [8] prohibiting the further purchases of City bonds.

There is no question that defendants as trustees of the TRS were empowered under New York law to invest in New York City and MAC bonds. Under N.Y.City Admin. Code § B20–31.0, the trustees have the same investment powers as the trustees of savings banks, as provided in Banking Law § 235, which sets forth a "legal list" of investments. Subdivision 4 permits a savings bank to invest in the obligations of a city if the faith and credit of the city is pledged for their repayment. Similarly, Public Authorities Law § 3018 (added by 1975 N.Y.Laws, ch. 168, § 1) (New York State Municipal Assistance Corporation Act) permits savings banks, trustees and other fiduciaries to invest in the notes and bonds of a municipal assistance corporation.

The statutory authorization to invest in a security of a particular class, however, does not relieve the trustee of the obligation to exercise prudence in respect to each individual investment. *Delafield v. Barret,* 270 N.Y. 43, 200 N.E. 67, 69 (N.Y. Ct. of Appeals 1936). The classic statement of the "prudent man rule" in New York is that "the trustee is bound to employ such diligence and such prudence in the care and management [of the fund], as, in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." *King v. Talbot,* 40 N.Y. 76, 85–86 (N.Y. Ct. of Appeals 1869). See, *In re Bank of New York,* 35 N.Y.2d 512, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700 (N.Y. Ct. of Appeals 1974); *In re Clark's Will,* 257 N.Y. 132, 177 N.E. 397, 398 (N.Y. Ct. of Appeals 1931). In the area of investment decisions, the obligation to exercise prudence is essentially an obligation to give primacy to the preservation of the trust estate and the procurement of a reasonable income while avoiding undue investment risks, see *e. g., King v. Talbot, supra,* at 86; *In re Mendleson's Will,* 46 Misc.2d 960, 261 N.Y.S.2d 525, 534 (Surrogate's Ct. 1965); Scott, *The Law of Trusts* § 227.3 (3d ed. 1967), and to make independent inquiry into the merits of particular investments rather than to rely wholly upon the advice of others. See, *e. g.,*

---

**8.** Actions to enjoin pension fund investments in City and MAC securities have failed in the New York State courts. *Simpson v. Mitchell,* N.Y. L.J., December 4, 1975, at 8, cols. 4–5 (Sup.Ct. N.Y. Co.) (Korn, J.), *aff'd,* 53 A.D.2d 590, 386 N.Y.S.2d 350 (1976); *New York City Civil Ser-*

*vice Retired Employees Ass'n v. Roche,* Index No. 18043/75 (Sup.Ct. N.Y. Co. October 17, 1975) (Kirschenbaum, J.); cf. *Sgaglione v. Levitt,* Index No. 4574/76 (Sup.Ct. Albany Co. March 26, 1976) (Hughes, J.).

*In re Clark's Will, supra,* at 399; Scott, *The Law of Trusts* § 227.1. In evaluating a trustee's investment decision under the prudent man rule, the focus of the court's inquiry is the individual investment itself rather than the performance of the portfolio as a whole. The New York Court of Appeals has stated that "[t]he fact that [a] portfolio show[s] substantial overall increase in total value during the accounting period does not insulate the trustee from responsibility for imprudence with respect to individual investments for which it would otherwise be surcharged." *In re Bank of New York, supra,* 364 N.Y.S.2d at 168, 323 N.E.2d at 703. The Court continued, however:

> "The record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water-tight compartment, since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions to achieve sound tax planning for the fund as a whole. The focus of inquiry, however, is nonetheless on the individual security as such and factors relating to the entire portfolio are to be weighed only along with others in reviewing the prudence of the particular investment decisions."

It seems clear that, had the City's potential bankruptcy not been a factor, the trustees' decision committing so large a portion of the TRS's assets to the purchase of the New York City bonds would have violated traditional notions of prudence as developed by the New York Court of Appeals. The bonds had an extremely low rating (apparently CAA, making them a speculative investment) and were not marketable except at inordinately high yields. The normal investment policy of the trustees

(and of the Comptroller as their investment agent),[9] as far as the fixed funds of the System were concerned, was to buy high-quality and preferably A-rated securities; the trustees were also concerned to maintain a diversification of their bond portfolio. In November 1975, the percentage of the TRS total assets invested in City and City-related securities was in the area of 17 percent; however, by April 1977, this percentage had risen to approximately 25 percent as the result of purchases pursuant to the November 26 Agreement, and the projection is that it will reach 37 percent as of June 30, 1978.

Goldberg and Shannon explicitly acknowledged in their testimony, and Mitchell and Scott implied, that under normal circumstances they would certainly not have purchased the City bonds, at least in the same quantity, since they did not comport with the fund's normal investment criteria. What determined the issue for the trustees was the specter of the City's bankruptcy, and, accordingly, the question becomes the extent to which this was a legitimate concern in the making of their investment decision.

Plaintiffs submit that in considering the interests of an entity apart from the fund, the trustees compromised their duty of undivided loyalty to the beneficiaries. They point out that Goldberg and Mitchell had received a legal memorandum (referred to at trial as the "Josephson Memorandum," apparently prepared by the law firm of Fried, Frank, Harris, Shriver & Jacobson) before November 26, which warned that trust fund investments motivated by interests "extraneous" to those of the beneficiaries, such as the general public welfare or the protection of employees' jobs, would (or would arguably) constitute breaches of fiduciary obligation. The memorandum cited *Blankenship v. Boyle*, 329 F.Supp. 1089 (D.D.C.1971), as a case in which the trustees had pursued such a course. There, the trus-

**9.** Generally, the Board of the TRS adopts, quarter-annually, a resolution granting the Comptroller investment authority over the fixed funds of the System. The Board resolved, however, in the fall of 1975, that investments in tax-exempt securities (e. g., City bonds) would require the prior approval of all of the trustees.

tees of the United Mine Workers pension fund allowed large sums of cash to accumulate in interest-free accounts in a Union-owned bank and invested significant Fund assets in the shares of electric utility companies, subsequently transferring to the Union proxies for a substantial number of the shares. The trustees' practices were designed to assist the Union in its efforts to buy control of the utilities and force them to burn Union-mined coal. Although aware of the suggestion that the beneficiaries' interests were ultimately served in that the level of pension fund receipts bore a direct relation to the tonnage of Union-mined coal, the Court conducted a close examination of the investment policy of the trustees and found that it was clearly designed to advance the Union's interests and not the Fund's and that there had therefore been a breach of fiduciary obligation on the part of the trustees. The Court specifically found that conflicts of interest were openly tolerated on the Board of Trustees and their implications generally ignored; that the Union representative on the three-member Board "knew [that] the large demand deposits [in the Bank owned by the Union] were unnecessary for any legitimate purpose of the Fund"; and, finally, that the utility stock purchases were "made primarily for the collateral benefits they gave the Union."

*Blankenship* was thus a case in which the trustees pursued policies which may incidentally have aided the beneficiaries of the fund but which were intended, primarily, to enhance the position of the Union and the welfare of its members, presumably, through the creation and/or preservation of jobs in the coal industry. The decision is inapplicable here. The trustees of the TRS gave consideration to the interests of the City of New York solely in its capacity as the major and indispensable contributor of monies to the pension system. Apparently to bring this case within *Blankenship*, plaintiffs questioned Mitchell and Goldberg as to whether influence had been exerted on their investment decision by the United Federation of Teachers ("UFT"). Goldberg testified that he had not had any discus-

sions with the UFT on the question, and Mitchell explained that the possibility of teacher layoffs as the result of the bankruptcy of the City of New York was simply not a relevant consideration for them in their capacity as trustees.

On the evidence, the Court concludes that neither the protection of the jobs of the City's teachers nor the general public welfare were factors which motivated the trustees in their investment decision. The extension of aid to the City was simply a means—the only means, in their assessment—to the legitimate end of preventing the exhaustion of the assets of the TRS in the interest of all of the beneficiaries. Notably, the importance of the solvency of the City to the TRS lay not only in its role as the major contributor of funds but also as the ultimate guarantor of the payment of pension benefits to participants in the TRS, pursuant to N.Y.City Admin.Code § B20–30.0.

Plaintiffs have also asserted that third deputy Comptroller William Scott was incapable of representing the interests of the beneficiaries of the fund, since, in his capacity as a City official, he was an architect and active proponent of the three-year plan of financial recovery. The New York Court of Appeals has stated in a similar case, however, that "a conflict of interest, created by statute . . . need not involve an incapacity to act because of the conflict, but only an especial obligation to act fairly on behalf of those concerned with the results of the action taken." *Westchester Ch., Civ. Serv. Emp. Ass'n v. Levitt*, 37 N.Y.2d 519, 521, 375 N.Y.S.2d 294, 295, 337 N.E.2d 748, 749 (1975). In this case, despite extensive probing by both plaintiffs and the Court, Scott firmly and convincingly adhered to the position that, in voting on the November 26 Agreement his "undivided loyalty" was to the TRS. Scott said:

"I think it was fully understood when I sat on the retirement board I sat as a trustee for the retirement board and not for the City of New York. I recognized that the interests of the City are not

necessarily always the same as the interests of the retirement system."

His conception of his role as representative of the City was simply to present to the trustees the "honest picture" of the City's finances, and his advocacy of the three-year plan derived solely from his realization of the unacceptable alternative—the bankruptcy of the City and the resulting depletion of the TRS fund.

Plaintiffs next contend that the trustees, collectively, breached a special duty of loyalty owed to the retired members of the TRS, in liquidating a portion of the fixed funds of the System to help finance the purchase of the City bonds. Their theory is that the fixed assets listed in the Annuity Reserve Fund and the Pension Reserve Fund No. 1 were reserved exclusively for the benefit of the retirees and were not usable for investments that might in any way jeopardize their lifetime retirement expectancies.

The main witness at trial supporting plaintiffs' position was a high school teacher of accounting and business practice, Joel Frank, who maintained that since an actuarially reserved pension system is *supposed* to be 100-percent funded at the time of retirement, assets sufficient to fund the liability to the retirees are reserved exclusively for their benefit. His computations indicated that the TRS's liability to retirees as of June 30, 1974 accounted for nearly 90 percent of the total assets of the System.

As evidence that a particular portion of the assets of the fund is, in effect, the exclusive property of the retirees, plaintiffs rely upon the accounting procedure employed by the TRS; that is, as members retire, assets sufficient to support their lifetime pensions and annuities are transferred, on the books of the System, from the Annuity Savings Fund and the Contingent Reserve Fund to the Annuity Reserve Fund and the Pension Reserve Fund No. 1, respectively. The statements that are received by the members of the TRS upon retirement list the assets in these funds separately. Accordingly, plaintiffs submit that the assets in question are allocated solely to retirees.

Although the statute governing the TRS does provide for the transfer of funds as above described, N.Y.City Admin.Code §§ B20–21.0 and B20–27.0, it nowhere vests retirees with exclusive rights to these funds in preference to the other beneficiaries. Both the chief accountant and the chief actuary of the TRS testified at trial that the transfer of the funds is merely a bookkeeping entry and no more. Neither witness even intimated that the assets in the Annuity Reserve Fund and the Pension Reserve Fund No. 1 "belonged to" or were the "property" of the retirees, as plaintiffs assert. They are not separately invested. Rather, as the witnesses explained, the assets of the four funds are commingled for investment purposes.

Moreover, while the theoretical goal of an actuarially reserved pension system is to be 100-percent funded, this was not the case with the TRS. As of June 30, 1974, there were assets on hand sufficient to cover only 40 percent of the System's total accrued liability to active and retired members. To have paid the full lifetime pensions and annuities of the retired members alone would have exhausted nearly 90 percent of the System's total assets.

At approximately the time the trustees purchased the City bonds, there were 25,250 retirees in the TRS as against 81,800 active members. Of the latter, roughly a third were either eligible to retire within the following year or had "vested interests" in their benefits by virtue of having completed 15 years of service. New York law imposes an obligation on trustees to accord impartial treatment to beneficiaries. *Redfield v. Critchley*, 252 App.Div. 568, 300 N.Y.S. 305, 310 (1937), *aff'd*, 277 N.Y. 336, 14 N.E.2d 377 (N.Y. Ct. of Appeals 1938); *In re Mendleson's Estate, supra*, at 534; Scott, *The Law of Trusts* § 183 (3d ed. 1967). It is more than evident, therefore, that the trustees of the TRS would have violated their fiduciary obligation had they exhausted the assets of an underfunded actuarially reserved pension system on a single class of beneficiaries (retirees). Their

obligation, plainly, was to manage the fund so as to enable it to meet its obligations not only to current retirees, but also to those scheduled to retire in the future, whose pension and annuity rights would have been similarly earned over their years of active service and to whom the fund therefore had a legal responsibility.

In November 1975, the trustees determined that continuing cash contributions from the City were crucial if the fund was to continue to operate for the benefit of all classes of beneficiaries. They therefore fulfilled their duty of undiscriminating loyalty to the beneficiaries in liquidating those fixed funds necessary to finance the purchase of the City bonds.

■ Plaintiffs suggest that the information available to the trustees that bankruptcy would result from a failure to consummate the November 26 Agreement, and contributions to the TRS cease, was "highly speculative" and "alarmist" and contrary to information in the Josephson memorandum. The Josephson memorandum advised that there were "inescapable elements of speculation in any attempt to 'bail out' the City by the use of pension funds. The trustees are unlikely to be able to ascertain with any definiteness the probability of default in the event of their refusal to invest or the actual consequences of default to the Retirement System."

The Josephson memorandum was prepared by a firm of lawyers—not financial analysts—who, as far as the Court has been shown, did not anticipate the hard data that would be forthcoming from experts as to the immediacy of the fiscal crisis facing the City. Felix G. Rohatyn, George D. Gould and Herbert Elish of MAC; William Scott, the third deputy Comptroller; and the contingency committee formed to consider the bankruptcy danger facing the City advised the trustees that the City would be insolvent on December 11, 1975 or shortly thereafter if the TRS were to refuse to participate in the November 26 Agreement. Furthermore, the trustees were advised of the calculations of Jonathan Schwartz that bankruptcy would result in the depletion of

the reserves of the TRS in 8 to 10 years if the System continued to meet its obligations to current and future retirees. Although, naturally, the information and views available to the trustees could not prognosticate the future with certainty, they came from highly reliable sources and represented the consensus of a broad spectrum of opinion. There was sufficient "definiteness" attached to them that the trustees would have been derelict in their duties had they disregarded the warnings.

The trustees had themselves reviewed the income and projected income figures of both the City and the TRS in consultation with Jack Bigel and the Comptroller and Corporation Counsel. Their decision to invest in the City obligations was thus forged from intensive independent analysis as well as consultation with experts. Under applicable New York law, the trustees clearly fulfilled their obligation of independently investigating the facts.

To suggest that their investment choice was the product of "compulsion"—that the choice was really that of City, State and MAC officials and pressed upon the trustees in an atmosphere of crisis—is to misread the testimony of the trustee-witnesses and to distort the circumstances surrounding the November 26 Agreement.

Naturally, because of the reality of the fiscal distress in which the City found itself in the summer and fall of 1975, events related to its finances proceeded at a brisk and pressurized pace. There were frequent meetings in which the trustees of the City's retirement systems were called upon to consider the purchase of MAC and City obligations and to evaluate the City's financial condition, and the trustees were indeed advised that bankruptcy was on the very near horizon. But the pressure of the circumstances did not render the trustees incapable of independent decision-making. As noted earlier, they exploited several opportunities in the weeks prior to November 26 to consider the actual figures on the City's financial state and the jeopardy the TRS would face without City funds. A draft of the November 26 Agreement was obtained

by the teacher-trustees in the middle of November for the purposes of study and consultation among themselves and with Jack Bigel. The teacher-trustees, according to Goldberg, went into the November 24 meeting at City Hall with a "list of conditions that [they] felt had to be met" before they would agree to the purchase of the bonds. It is true that pressure was exerted by both the Governor's office and by City Hall, but that pressure did not overbear the judgment of the trustees, despite the fact that the four other retirement systems had already approved the terms of the Agreement. The teacher-trustees withheld their approval until convinced that they had obtained the fullest possible protection for their beneficiaries. Their process of decision, as the record fully supports, was a rational one of weighing the negative against the positive. Their hesitation as to the quality of the bonds and the undesirability of committing so large a proportion of the fund's assets to a single class of security was outweighed by what they conceived as their paramount obligation to insure the survival of the fund, and at a limited cost, since the purchase of the bonds was in effect to be financed by the continuing cash contributions from the City. Although the bonds were, as a practical matter, unmarketable, the intention of the trustees was to hold them to maturity, and, in this connection, they properly took account of the fact that their own purchases were not made in isolation but as part of a cooperative three-year plan providing an apparently solid basis for the City's financial recovery.

Plaintiffs sought to establish at trial that the trustees would not have agreed to purchase the City bonds in the absence of the indemnification provision of Chapter 890. Plaintiffs theorized that, to aid the City, the trustees consciously violated fiduciary standards in the secure knowledge that the City would bear the cost of any judgment against them. To the contrary, the trustees testified—and their testimony is fully credited by this Court—that their actions were taken for the sole benefit of the TRS and that they were firmly of the belief that they were acting in accordance with their

fiduciary responsibilities. In the trustees' reckoning, the principal value of the indemnification provision was that it would ultimately insure indemnification of *the System* in the event of financial loss. That they were also personally indemnified was no doubt reassuring, but not the prime mover in their decision.

 In conclusion, since the trustees had firm grounds for believing, after careful deliberation, that the alternative to purchasing the "highly speculative" City bonds would be the bankruptcy of their own retirement fund, their decision to accept the terms of the November 26 Agreement, on behalf of the TRS, was a prudent one. Their investment context was distinguishable from the normal one in which "speculation" implies risking the corpus of the trust estate; in the case before them, purchasing "speculative" obligations was the *sine qua non* of preserving the corpus. Thus, under the unique circumstances presented—in which the survival of "the fund as an entity" necessarily achieved prominence—the trustees' investment decision was such as to fulfill their fiduciary obligations to the TRS.

### Constitutional Claims

 Plaintiffs assert a number of constitutional claims under the due process and equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution and under the contract clause, Article 1, Section 10, Clause 1. The first is that the trustees' sale of pension assets (having a "clearly definable and sizeable market value") in connection with their purchase of the City bonds constituted a taking of plaintiffs' property without just compensation or due process of law. The meaning of the term "property" as used in the Fifth Amendment is to be determined by reference to state law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *United States v. Causby*, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Gotkin v. Miller*, 514 F.2d 125, 128 n. 5 (2d Cir. 1975); *Tron v. Condello*, 427 F.Supp. 1175, 1189 (S.D.N.Y.

1976). In *Board of Regents v. Roth, supra,* the Supreme Court explained that

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

There is no question that plaintiffs have an entitlement under New York law to receive their pension payments, see *Tron v. Condello, supra*; however, they have no entitlement to, or right to direct the retention of, the particular assets that are held for investment purposes in the pension fund. The New York Court of Appeals stated in *Sgaglione v. Levitt,* 37 N.Y.2d 507, 513, 375 N.Y.S.2d 79, 84, 337 N.E.2d 592, 595 (1975) ("*Sgaglione I*") that

" * * * neither plaintiffs nor the courts * * * are entitled * * * to assess the market worthiness of securities in which [a public pension fund trustee] may invest. That discretion is his solely except as limited by the continuing power of the Legislature to expand or restrict the classes and kinds of investment in which he may place the funds in his care."

Plaintiffs thus lack a property interest upon which due process protections could attach.

■ Plaintiffs' next claim is that Chapter 890 violates the Equal Protection Clause. Their argument is that the legislation invidiously discriminates against the class of "retired public employee teachers" in "compelling the taking of their pension fund assets" in contradistinction to those of other public and private workers.

Chapter 890, in pertinent part, does not compel but merely *authorizes* the trustees of the City's five retirement systems, in their discretion, to purchase obligations of the City of New York; it allows the trustees to consider in making their investment decision whether the City will be able to continue fulfilling its obligation to make contributions to the pension funds; and,

finally, provides that the City will indemnify the trustees for any liability that might result from their sale of pension fund assets to produce sufficient revenues for the purchase of the City obligations.

Since the legislation neither infringes on the exercise of a fundamental right nor operates to the peculiar disadvantage of a suspect class, see, generally, *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *San Antonio School District v. Rodriguez,* 411 U.S. 1, 30–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); cf. *Clark v. United States,* 447 F.Supp. 172 (N.D.Ill.1978), the only inquiry is whether the statutory classification bears some rational relationship to a legitimate state purpose. *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 172, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). There can be no doubt that it does. Chapter 890 was enacted as an integral part of the financial plan to stave off the City's default. The statutory classification is not "retired teachers" but rather the five retirement *systems* of the City, which have an immediate and direct interest in the City's fiscal viability on the basis of their dependence on the City's annual cash contributions. Essentially, the statute permits the trustees to protect a source of their funds through discretionary purchases of City obligations without numerical limit, and, additionally, insures payment from the City to the retirement systems in the case of financial loss. These provisions are rationally related to the legislative objectives of maintaining the solvency of the City and of the pension funds themselves.

■ Chapter 890 is also claimed to have impaired the obligation of contract. The identical claim was raised and rejected in *Tron v. Condello, supra,* at 1186–89.

■ Plaintiffs' final constitutional argument is directed to Public Law 94–236, 90 Stat. 238 (1976), which permits the five New York City pension funds that were party to the November 26 Agreement to hold and acquire obligations of the City of New York without losing their tax-exempt

status under the Internal Revenue Code. This legislation is claimed to have violated plaintiffs' rights under the due process clause of the Fifth Amendment and to have impaired the obligation of contract. Since, as indicated above, plaintiffs did not have a property interest in the particular assets held by the pension system, their claim of an unconstitutional taking under the due process clause is untenable. See, *Kirshner v. United States*, 77 Civ. 665 (S.D.N.Y. June 13, 1977) at 7. Furthermore, the statutory classification clearly satisfies the standard of rationality for purposes of Fifth Amendment due process in that the preservation of the tax-exempt status of the City's pension funds was an essential link in federal efforts to insure the fiscal preservation of the City of New York. See, Hearings on H.R. 1700 Before the House Ways and Means Committee, 94th Cong., 2d Sess. (February 23, 1976); legislative findings set forth in the New York Seasonal Financing Act of 1975, 31 U.S.C. § 1501 *et seq.* at 403; *Kirshner v. United States, supra*, at 8. Finally, the contract clause claim is not maintainable, since the clause applies solely to state legislation, not to acts of Congress. See, *e. g., New York v. United States*, 257 U.S. 591, 601, 42 S.Ct. 239, 66 L.Ed. 385 (1922); *Kirshner v. United States, supra*, at 7.

*Conclusion*

Plaintiffs have failed to establish that defendants as trustees of the TRS breached their fiduciary obligations to plaintiffs or the class of retired teachers they purport to represent. Plaintiffs' claims for damages and for injunctive relief prohibiting the trustees' further purchases of New York City bonds are therefore dismissed. The claims challenging the constitutionality of Chapter 890 of the Laws of New York of 1975, Public Law 94–236, and the action of the trustees in effecting the sale of various of the assets of the pension fund are also dismissed. Plaintiffs originally included in their complaint a claim for relief under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a). Plaintiffs have apparently aban-

doned this claim, and it is now dismissed with prejudice.

The Complaint is dismissed.

SO ORDERED.