Dear Mrs. Fike:
This is to acknowledge receipt of your request for a formal opinion from this office which reads as follows:
 Advice is requested as to whether or not the Missouri State Employees' Retirement System has authority to make a loan to the Chrysler Corporation in the amount of twenty-five million dollars ($25,000,000.00) and receive as security for the investment, a first mortgage lien on the land, buildings, and equipment known as the Chrysler Chelsea Proving Grounds located in Chelsea, Michigan.
In your opinion request, you have attached a letter dated February 7, 1980 along with documents and data concerning the Chrysler Chelsea Proving Grounds. It is our understanding that this letter is the formal proposal of the Chrysler Corporation concerning the loan. This letter reads in part as follows:
 Chrysler Corporation wishes to borrow a total of $25 million from the Missouri State Employees Pension Fund, the other Missouri State's Pension Funds, the City of St. Louis Pension Funds, the County of St. Louis Pension Funds or any combination thereof. The security for the Pension Funds' investment would be a first mortgage lien on the land, buildings, and equipment known as the Chrysler Chelsea Proving Grounds located in Chelsea, Michigan.
 It is proposed that the loan bear the then current mortgage market interest rate for property of this nature at the time the loan is made, that the loan be for a period of fifteen years, that interest only be paid until January 1, 1984, that the entire principal of the loan together with interest be amortized over the remaining term of the loan beginning January 1, 1984 and that Chrysler Corporation have the option to repay the loan without penalty at any time. It is further proposed that the loan shall be made only after the following conditions are met:
 1. An appraisal of the Proving Grounds by an appraiser selected by you and paid for by Chrysler Corporation shall show a fair market value for the Proving Grounds of at least $33.34 million in order to meet the loan ratios required for investments under the Missouri pension laws.
 2. Assurance have been received from the Loan Guarantee Board under the Chrysler Corporation Loan Guarantee Act of 1979 that the loan qualifies as nonfederally guaranteed assistance from a State government for purposes of the Act.
 3. Waivers to obtain the loan have been received from existing Chrysler Corporation lenders where required.
 4. Adequate assurances have been received from the Federal Government that any Federal interest is fully subordinated to Missouri's claim.
 5. Necessary legal documentation for the loan acceptable to all parties to the transaction will have been agreed upon.
Although the formal Chrysler proposal appears to indicate that a first mortgage lien on the land, buildings and equipment will be given as security for the proposed loan, it is our understanding that the primary issue for consideration is whether or not the Retirement System can make a loan to the Chrysler Corporation in the amount of twenty-five million dollars ($25,000,000.00) and receive as security for the investment a first mortgage lien on the land and buildings known as the Chrysler Chelsea Proving Grounds located in Chelsea, Michigan. Therefore, at this time, we will only consider the authority of the Retirement Board to make a loan secured by a first mortgage on the land and buildings.
 I. DISCUSSION OF FEDERAL LEGISLATION
P.L. 96-185, which is cited as the Chrysler Corporation Loan Guarantee Act of 1979 (hereinafter referred to as the Act), was signed into law by the President of the United States on January 17, 1980. Subsection 9 of Section 2 of the Act defines the term "persons with an existing economic stake in the health of the Corporation" to include state, local and other governments. Section 3 of the Act established the Chrysler Corporation Loan Guarantee Board (hereinafter referred to as Board) which is responsible for the administration of the Act. The Board has authority under the provisions of Section 8(c) of the Act to extend government loan guarantees for the Chrysler Corporation in an amount not to exceed $1,500,000,000.00. However, Section 4(a) of the Act provides that the Board may make such commitments only if at the time the commitment is issued, the Board determines that:
 (1) There exists an energy-savings plan that is satisfactory to the board and can be carried out by the company.
 (2) The borrowed funds are needed to enable the company to continue production, and the failure to secure such funds would adversely affect the economy or employment in any region of the country.
 (3) The corporation has submitted a satisfactory operating plan for fiscal 1980 and the next three fiscal years demonstrating its ability to continue operations.
 (4) The corporation has submitted a satisfactory financing plan to meet its operating needs that includes at least $1,430,000,000 of nonfederally guaranteed assistance from: parties with an existing economic stake in the company; the merger or the sale of assets or securities; and the issuance of $100,000,000 in common stock for sale to its employees.
 (5) The board has received adequate assurances that all components of the financing plan will be available and that such financing is adequate.
 (6) The corporation's creditors waive their rights to recover under any prior credit commitment which may be in default unless the board determines that the exercise of those rights would not adversely affect the operating plan.
 (7) No credit issued before Oct. 17, 1979, be converted to a guaranteed loan. (Summary taken from Congressional Quarterly Weekly Report Vol. 38 No. 3, p. 137-138, January 19, 1980.)
In addition Section 4(b)(1) of the Act reads in part as follows:
 For the purpose of computing the aggregate amount of at least $1,430,000,000 in nonfederally guaranteed assistance required to be provided under subsection (a)(4):
 (A) the term "financial commitment" means a legally binding commitment to provide additional nonfederally guaranteed assistance to meet the financing needs of the Corporation in excess of any such commitments outstanding as of October 17, 1979;
 (B) the term "concession" means a legally binding commitment (or in the case of a concession from a State, local, or other government, a concession for which the Board has received adequate assurances) which will result in a reduction in the financing needs of the Corporation by an amount which is more than the amount of any reduction accomplished by any concessions outstanding as of October 17, 1979, and, except for a loan or other credit, shall be nonrecoupable; . . .
Further, Section 4(c) of the Act provides that the $1.43 billion in non-federally guaranteed assistance shall include:
 (1) At least $500,000,000 from domestic banks, financial institutions and other creditors, of which at least $400,000,000 shall be new loans or credits and $100,000,000 shall be concessions on outstanding debt.
 (2) At least $150,000,000 from foreign banks, financial institutions and other creditors in the form of new loans or credits.
 (3) At least $300,000,000 from the sale of corporate assets.
 (4) At least $250,000,000 from state, local and other governments.
 (5) At least $180,000,000 from suppliers, and dealers, of which at least $50,000,000 shall be in the form of capital.
 (6) At least $50,000,000 from the sale of additional issues of stock. (Summary taken from Congressional Quarterly Weekly Report Vol. 38 No. 3, p. 137-138, January 19, 1980.)
It should also be specifically noted that under Section 4(c) of the Act the Board may, as necessary, modify the amounts of assistance required to be provided by any of the categories referred to above, so long as the aggregate amount of at least $1,430,000,000 in non-federally guaranteed assistance is provided under Section 4(a)(4).
Section 11 of the Act refers to the protection of the interest of the federal government. In this regard, Section 11(f) of the Act provides that the Board may bring an action in any United States District Court or any other appropriate court to enforce compliance with the provisions of the Act or any agreement related thereto. Section 11(i)(1) of the Act relates to the priority of the federal government as to the assets of the Chrysler Corporation in case of default and reads as follows:
 (i)(1) Notwithstanding any other provision of law and subject to paragraphs (2), (3), and (4) whenever any person is indebted to the United States as a result of any loan guarantee issued under this Act and such person is insolvent or is a debtor in a case under title 11 United States Code, the debts due to the United States shall be satisfied first.
 (2) Subject to paragraphs (3) and (4), the Board may waive the priority established in paragraph (1) if:
 (A) the Board determines that the waiver of such priority is necessary to facilitate the ability of the Corporation, or any borrower to obtain financing; and
 (B) the Board determines that, despite such waiver, there is a reasonable prospect of repayment of the loans guaranteed under this Act.
 (3) Subject to paragraph (4), waivers under paragraph (2) may only be issued:
 (A) with respect to any State or local government;
 (B) with respect to a supplier of the Corporation, except that no supplier of the Corporation may receive waivers under paragraph (2) with respect to claims of such supplier in an amount of more than $100,000; and
 (C) with respect to loans made after October 17, 1979 by any creditor of the Corporation up to a total of $400,000,000.
 (4) A waiver under paragraph (2) with respect to a supplier of the Corporation or any creditor of the Corporation under paragraph (3) (C) may not by its terms subordinate the claims of the United States under this Act to those of any other creditor of the Corporation or of any borrower.
Thus, under the above provisions, the Federal Government will have full priority as a creditor with respect to certain loans to the Chrysler Corporation. However, it can waive priority with respect to claims of any state or local government.
A serious question can be raised as to whether the retirement system is a "state or local government" for purposes of obtaining a waiver of the federal government's priority. At the writing of this opinion we cannot give assurances that such a waiver would be authorized for the retirement system under the federal legislation. Certainly, prior to the extension of any loan to Chrysler, it would be necessary for the retirement system to be assured by the federal government that a waiver had been granted.
As a result of the foregoing summary of the federal legislation, it is our view that any loan made to the Chrysler Corporation by the Missouri State Employees' Retirement System would be authorized only if the federal government waives its priority as to assets of the Chrysler Corporation in the event of its default.
 II DISCUSSION OF STATE EMPLOYEES' RETIREMENT SYSTEM
The Missouri State Employees' Retirement System, as now provided for in Chapter 104 of the Revised Statutes of Missouri, came into formal existence on September 1, 1957 under an act of the Sixty-ninth Missouri General Assembly, for the purpose of providing retirement allowances and other benefits for employees and public officials of the State of Missouri. Laws of Missouri
1957, pages 706, 707. Section 104.320 RSMo 1978 provides that the Missouri State Employees Retirement System shall be a body corporate and an instrumentality of the state in the department of revenue. Under the provisions of Section 104.450 RSMo 1978, the Retirement System is governed by a board of trustees consisting of the state treasurer, the commissioner of administration, the director of the personnel division, one member of the senate appointed by the president pro tem of the senate, one member of the house of representatives appointed by the speaker of the house, two members of the system who are appointed by the governor, and two members of the system who are elected by the members themselves. The statutory provision relating to the funds of the Retirement System and their investment, are found in subsections 1 and 3 of Section 104.440 RSMo 1978 and read as follows:
 1. The board shall set up and maintain a Missouri state employees' retirement and benefit fund account in which shall be placed all payroll deductions, deferred compensation, payments, and income for all sources. All property, money, funds, investments, and rights which shall belong to, or be available for expenditure or use by, the system shall be dedicated to and held in trust for the members and for the purposes herein set out and no other. The board shall have power, in the name and on behalf of the system, to purchase, acquire, hold, invest, lend, lease, sell, assign, transfer, and dispose of all property, rights, and securities, and enter into written contracts, all as may be necessary or proper to carry out the purposes of sections 104.310 to 104.550.
 3. So far as practicable, the funds and property of the system shall be kept safely invested so as to earn a reasonable return. The board may invest the funds of the system as permitted by laws of Missouri relating to the investment of the capital, reserve, and surplus funds of life insurance companies or casualty insurance companies organized under the laws of Missouri.
Thus, under the above statutory provisions, all property, money, funds, investments, and rights which shall belong to or be available for expenditure or use by, the system shall be dedicated to and held in trust for the members and for the purposes set out in Chapter 104 and no other. The board of trustees has authority to make investments and so far as practicable, the funds and property of the system shall be kept safely invested so as to earn a reasonable return. The board may invest the funds of the system as permitted by the laws of Missouri relating to the investment of the capital, reserve, and surplus funds of life insurance companies or casualty insurance companies organized under the laws of Missouri. As a result, we now consider the statutory provisions relating to investments by insurance companies.
 III DISCUSSION OF SECTION 379.080 RSMo 1978
As we have previously suggested, the board of trustees of the Missouri State Employees' Retirement System may invest the funds of the system as permitted by the laws of Missouri relating to the investment of the capital, reserve, and surplus funds of casualty insurance companies organized under the laws of Missouri. Insurance companies other than life, or "casualty insurance companies" are defined by Section 378.010 RSMo 1978. The investment of capital and other funds of casualty insurance companies is set forth in Section 379.080 RSMo 1978. In this connection, subsection 1 of Section 379.080 RSMo 1978 provides in part as follows:
 1. No company formed on the joint stock plan for the purpose of doing any of the kinds or classes of business mentioned in subdivision (1), (2), or (3) of section 379.010, shall hereafter commence business with a capital of less than four hundred thousand dollars and a surplus of at least four hundred thousand dollars, except plate glass insurance companies and accident insurance companies, which may be permitted to do business with a capital of one hundred thousand dollars and a surplus of at least one hundred thousand dollars; and before any such company shall proceed to do business, the capital of that company shall be wholly paid in, and two hundred thousand dollars thereof, if a plate glass insurance or accident insurance company, and eight hundred thousand dollars thereof, if any other company mentioned in said section 379.010, be held in cash or invested in treasury notes or bonds of the United States, or in bonds of the state of Missouri, or in bonds issued by any school district of the state of Missouri, or in funded bonds of any county or municipal township of this state, or in bonds and mortgages or deeds of trust on improved unencumbered real estate in this or any other state worth at least double the amount loaned thereon, the valuation of the real estate so mortgaged to be determined by the director after a personal examination, or after an examination made by some competent disinterested person specially appointed by him for that purpose; such bonds shall not be received at a rate above their actual market value; and the remainder of the capital of these companies and their other assets may be invested either in the property or securities in this section above mentioned, or in loans safely secured by collateral worth, at its cash market value, not less than twenty percent in excess of the amount loaned thereon or in stocks, bonds or evidences of indebtedness issued by corporations organized under the laws of this state, or of the United States, or of any other state, or, so far as may be necessary to make deposits with the authorities of foreign countries to do business therein, the bonds of such foreign countries; . . . (Emphasis added)
It must be borne in mind that in interpreting the provisions of § 379.080, above quoted, we are called upon to determine that section's application to investments made by the Board of Trustees of the Missouri State Employees' Retirement System. As so interpreted it is our view that the portion of that section which we have underscored which requires security of at least double the amount loaned on improved unencumbered real estate is the applicable provision and that it was not the legislative intent that retirement funds be invested with any less security. It may be arguable that under other provisions above quoted the collateral need only be not less than twenty percent (20%) in excess of that amount loaned thereon. Adoption of that view, would by definition provide the retirement system funds with less security than is required for the combined capital and investment of casualty insurance companies. As a result, it is our view as legal advisor to the Board of Trustees that the requirement of double the amount loaned is the applicable requirement.
Therefore, insofar as authorized investments under § 379.080.1 are concerned, the mortgage or deed of trust on unencumbered real estate must be at least double the amount loaned and no less.
Section 379.080 does not expressly limit the amount to be loaned except as it relates to the security for the loan. However, it is also clear that in determining the amount to be loaned under this section, the Board of Trustees would be held to a prudent standard of investment. We will discuss this aspect later.
Section 379.080 also refers to a valuation of the property and requires that it be determined by the Director of the Division of Insurance after the Director's personal examination or after an examination made by some competent disinterested person specially appointed by him for that purpose. We take this requirement to mean that if the Board reaches a point wherein an appraisal is thought to be desirable, the Board should communicate its desire to the Director of the Division of Insurance in order to satisfy the letter of the law. The Board must satisfy itself that a proper appraisal is made. In other words, for purposes of the loan decision, the appraisal of the land is fundamentally and inherently the responsibility of the Board of Trustees. As a consequence, if the Board of Trustees considers making such a loan, it must see that an appraisal of the value of the land is made which reflects the actual worth of the land, i.e. what it would readily bring on the market in the event Chrysler went into bankruptcy.
 IV DISCUSSION OF SECTION 376.300 RSMo 1978 AS AMENDED BYSENATE BILL NO. 322 FIRST REGULAR SESSION 80th GENERAL ASSEMBLY
The investment of the capital, reserve, and surplus funds of life insurance companies organized under the laws of the State of Missouri is set forth in § 376.300 and other statutory provisions which are not relevant to your inquiry. Subsection 1 of § 376.300 provides as follows:
 1. All other laws to the contrary notwithstanding, the capital, reserve and surplus of all life insurance companies of whatever kind and character organized under the laws of this state shall be invested only in the following: . . .
Subdivision 9 of subsection 1 of Section 376.300 relating to certain real estate loans, reads as follows:
 (9) Loans evidenced by notes or other evidences of indebtedness and secured by first mortgage liens on unencumbered real estate or unencumbered leaseholds having at least twenty-five years of unexpired term, such real estate or leaseholds to be located in the United States, any territory or possession of the United States. Such loans shall not exceed seventy-five percent of the fair market value of the security of the loan, except that any life insurance company may sell any real estate acquired by it and take back a purchase money mortgage or deed of trust for the whole or any part of the sale price; and such percentage may be exceeded if and to the extent such excess is guaranteed or insured by the United States, any state, territory or possession of the United States, any city within the United States having a population of one hundred thousand or more or by an administration, agency, authority, or instrumentality of any such governmental units; and said percentage shall not exceed one hundred percent if such a loan is made to a corporation which qualifies under subdivision (5) for investment in its bonds, notes or other evidences of indebtedness, or if the borrower assigns to the lender a lease or leases on said real estate providing rentals payable to the borrower in amounts sufficient to repay such loan with interest in the manner specified by the note or notes evidencing such loan and executed as lessee or lessees by a corporation or corporations, which qualifies under subdivision (5) for investment in its or their bonds, notes or other evidences of indebtedness. No mortgage loan upon a leasehold shall be made or acquired pursuant to this subdivision unless the terms of the mortgage loan shall provide for amortization payments to be made by the borrower on the principal thereof at least once in each year in amounts sufficient to completely amortize the loan within four-fifths of the term of the leasehold which is unexpired at the time the loan is made, but in no event exceeding thirty years. Real estate or a leasehold shall not be deemed to be encumbered by reason of the existence in relation thereto of
 (a) Liens inferior to the lien securing the loan made by the life insurance company;
 (b) Taxes or assessment liens not delinquent;
 (c) Instruments creating or reserving mineral, oil or timber rights, rights-of-way common or joint driveways, easements for sewers, walls or utilities;
 (d) Building restrictions and other restrictive covenants; or
 (e) An unassigned lease reserving rents or profits to the owner.
On the other hand, subsection 2 of Section 376.300
provides as follows:
 2. No such life insurance company shall invest in any of the foregoing securities in excess of the following percentages of the admitted assets of such company, as shown by its last annual statement preceding the date of acquisition, as filed with the director of the insurance division of the state of Missouri:
Thereafter, subdivision (2) of subsection 2 of Section 376.300
reads as follows:
 (2) One percent of its admitted assets or ten percent of its capital and surplus, whichever is greater, in any single loan on real estate under subdivision (9) of subsection 1;
It is our view that subparagraph 2(2) of § 376.300 cannot be applied to the investment of funds of the Retirement System in the same manner that it would be applied to such insurance companies. The Retirement System does not have capital and surplus although it does certainly have assets. An insurance company which comes under this section would have the benefit of investments made pursuant to both the one percent and ten percent requirements of such subsection. However it seems clear that the legislature in Section 376.300, which provides for loans not exceeding 75% of the fair market value of the security for the loan did not intend that the Retirement System be permitted to make investments on the basis of ten percent of its assets. Therefore, the system must be held to the restriction to one percent of its assets. We reach this conclusion because to do otherwise would give these provisions an interpretation which would allow the Board of Trustees to assume a risk which would be greater than the risk that the legislature has allowed such insurance companies under the same statute. In our view the ten percent limitation is not applicable and the one percent limitation, must be applied in determining the amount of the loan which the Retirement System may make under § 376.300.
Therefore, the Retirement Board has authority to make loans secured by unencumbered real estate in an amount not exceeding 75% of the fair market value of the real estate and not exceeding 1% of the assets of the retirement system.
 V DISCUSSION OF PRUDENT MAN RULE
We have previously pointed out earlier in our discussion that under the provisions of subsection 1 of Section 104.440
RSMo all property, money, funds, investments, and rights which shall belong to or be available for expenditure or use by the system shall be dedicated to and held in trust for the members of the Retirement System and for the purposes set out in Chapter 104 and no other. Further, under the provisions of subsection 3 of Section 104.440 RSMo 1978, the board of trustees has authority to make investments and so far as practicable, the funds and property of the system shall be kept safely invested so as to earn a reasonable return. In this regard, it was pointed out in Attorney General Opinion No. 176 Bode, 7-12-67 that the purpose of subsection 3 of Section 104.440 RSMo is to prescribe investments authorized for the Missouri State Employees Retirement System and that the fiduciary duties of the board of trustees of the retirement system are of a higher order than the duties of the board of directors of an insurance company.
For a fundamental statement of the high standards governing those who invest trust funds we direct your attention to the case of Rand et al. v. McKittrick, 142 S.W.2d 29, where the Court referred to the Restatement of the Law, on Trusts, and stated at page 31 as follows:
 As to the duty of a trustee in making investments, see sec. 227, page 645, of the same book, where we find the rule as follows:
 "In making investments of trust funds the trustee is under a duty to the beneficiary
 "(a) in the absence of provisions in the terms of the trust or of a statute otherwise providing, to make such investments and only such investments as a prudent man would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived."
 This latter statement is the yardstick generally used by the courts of the union in determining the duties of a trustee. Courts following the New York rule, as well as those following the Massachusetts rule, are in perfect harmony on this question. It is also the rule in this state. See Cornet v. Cornet 269 Mo. 298, 190 S.W. 333, loc. cit. 339(5).
 An analysis of these cases will disclose that the courts of the land have required trustees of trust funds to exercise a greater degree of care and caution when investing such funds than prudent men ordinarily exercise when investing their own funds. Investments which are speculative in nature have been universally tabooed, by the courts of the union, as proper investments for trust funds. Yet prudent men may and do invest in speculative enterprises. Wild v. Brown 120 N.J.Eq. 31, 183 A. 899. Hence the rule is well stated, Restatement of the Law, on Trusts, supra, that trustees may "make such investments and only such investments as a prudent man would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived." The part we have italicized is important. If that rule is adhered to, does it become necessary, or is it expedient or advisable for a court to arbitrarily declare any particular class of securities as unfit for trust investments? We think not. . . . We think this demonstrates that the preservation of trust estates depends more upon the integrity, honesty and business acumen of the trustees than it does upon arbitrary legal classification of securities wherein trust funds may be invested. Changed economic conditions often play havoc with the best laid plans. For example, a favorite investment, that is, first mortgage security on farm lands and other real estate, due to a changed economic condition, was the cause of many banks closing their doors in recent years. . . . (Emphasis in original)
The Court then quoted with approval from the case of Walkerv. Buhl, 211 Mich. 124, 178 N.W. 651, 12 A.L.R. 569, as follows:
 "When such a fund passes into the hands of a trustee, it becomes impressed with a double duty: First, to so invest it that it can be turned over at the expiration of the trust period without loss; and, second, to secure an income therefrom. He must act honestly and faithfully, and in what he believes to be the best interest of the cestui que trust. He must exercise a sound discretion. He is bound to proceed with diligence in investigating the nature of the proposed investment, and to use such care in deciding as, in general, prudent men of intelligence and integrity in such matters employ in their own affairs when making a permanent investment, in which the primary object is the preservation of the fund and the secondary one that of obtaining an income therefrom. He must not permit himself to take the hazard of an investment with the hope of largely increasing the fund as he might, perhaps, do in the prudent management of his own estate. The entire element of speculation must be removed. He must at all times remember that he is handling a trust fund, the care of which has been intrusted to him in reliance on his integrity, fidelity and sound business judgment."
Also, in the case of Vest v. Bialson, 293 S.W.2d 369 (Mo. 1956), the Supreme Court of Missouri held that although the finding of the trial court that the trustee had not been guilty of dishonesty or bad faith would be accepted, nevertheless the trustee's sale of corporate stock and the reinvestment of the proceeds in real estate thereby making the entire investment of the trust in real estate was such that he would be surcharged for a loss in connection therewith.
The Court pointed out in making investments of trust funds that the trustee must consider first the safety of the investment and second the diversification of the investment in order to minimize the risk of loss. In addition, in discussing the discretion of the trustee, the court made the following comments on page 380:
 . . . As stated in comment i under Sec. 187, "Although discretion is conferred upon the trustee as to the choice of investments, he cannot properly invest in hazardous securities." Likewise as said in comment v, Sec. 277, "An authorization by the terms of the trust to invest in a particular type of security does not mean that any investment in securities of that type is proper. The trustee must use care and skill and caution in making the selection. * * * Where by the terms of the trust discretion is conferred upon the trustee to make certain investments, he is subject to liability if he abuses the discretion (see Sec. 187). Thus, if the trustee is permitted to invest in a particular security in his discretion and the circumstances are such that it would be beyond the bounds of a reasonable judgment to make the investment, the trustee is subject to liability if he makes it." Furthermore, a trustee is in a fiduciary relation to the beneficiary and "is under the duty to the beneficiary to administer the trust solely in the interest of the beneficiary." (Emphasis ours.) Restatement of Trusts, Sec. 170. This is the primary duty of any trustee and must be the principle guide to be considered in the construction of any powers given him by the trust instrument and the propriety of his acts under them. "He is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries." Scott on Trusts, Sec. 170.
Therefore, in addition to the specific statutory restrictions on the proposed Chrysler loan, we conclude that the members of the Board of Trustees of the Missouri State Employees' Retirement System, in administering and investing the funds of the system are bound by the general law respecting trusts and trustees.
We wish to emphasize that although the statutes may authorize a particular kind of investment, and may even specify a level of security it may well be that such an investment does not conform to the prudent man rule as detailed in the foregoing cases.
For example, we note that in Withers v. Teacher RetirementSystem, et al., 447 F. Supp. 1248 (S.D. N.Y. 1978), beneficiaries of the New York City Teacher Retirement System brought an action against the trustees of the retirement system seeking damages and injunctive relief prohibiting further investment of pension assets in securities and obligations of the City of New York. The court stated in part, at page 1254:
 . . . The statutory authorization to invest in a security of a particular class, however, does not relieve the trustee of the obligation to exercise prudence in respect to each individual investment. Delafield v. Barret, 270 N.Y. 43, 200 N.E. 67, 69 (N Y Ct. of Appeals 1936). . . .
The court in Withers supra, further indicated that had the city's potential bankruptcy not been a factor, the decision of the trustees to commit so large a portion of the assets of the retirement system to the purchase of the New York City bonds would have violated traditional notions of prudence as developed by the New York Court of Appeals. There, of course, the survival of the retirement system of the City of New York was intricately interwoven with the financial condition of the city.
We note that on September 2, 1974 the Employee Retirement Income Security Act of 1974, commonly known as ERISA became effective. In general, governmental plans are excluded from its provisions relating to reporting, disclosure, fiduciary and investment standards. However, final regulations have been published by the Department of Labor which is responsible for the administration of ERISA with respect to the investment of plan assets under the "prudent man rule". The Board of Trustees may wish to give some consideration to those standards, as a guide to common and generally accepted concepts of the prudent man rule which we have heretofore discussed. See C.F.R. § 2550, 404A-1.
 VI FEDERAL BANKRUPTCY CONSIDERATIONS
In discussing the legislative history of the Chrysler Corporation Loan Guarantee Act of 1979, the following statement was made in the United States House of Representatives' Committee on Banking, Finance and Urban Affairs in House Report 96-690, 1980 U.S. Cong. Adm. News, Vol. 11a, 96 Cong. 1st sess. at p. 4995:
 A crucial element in your Committee's decision to approve loan guarantees for Chrysler involved a judgment as to the company's chances of succeeding in the marketplace following a period of bridging assistance from the Federal Government. While the Committee examined various detailed forecasts, including those of the Treasury and outside analysts such as Booz, Allen Hamilton, there can be no clear-cut answer to this question of judgment. Chrysler's prospects will depend critically upon two variables that cannot be precisely forecast — the overall volume of United States automobile and truck sales in the years immediately ahead, and Chrysler's market penetration.
 Given these uncertainties, your Committee shares the judgment of Secretary of the Treasury Miller that "there can be no assurance of success with this or any other plan". It would be irresponsible to promise unequivocally that Chrysler, with this help, will "make it" in the future.
 However, your Committee also shares Secretary Miller's conclusion that "the financing approach is sound and the underlying business plan can remedy Chrysler's weaknesses." The market and other assumptions, on which the estimated need for external assistance of $3 billion is based, are conservative. The testimony indicated nearly universal approval of the company's future product plans, including a massive switch toward smaller and more fuel-efficient cars. In these circumstances, it would be equally irresponsible to deny assistance on the basis of "worst case" assumptions when there are reasonable prospects for success.
As a result of the above, it is submitted that one of the considerations by the Board of Trustees in making a proposed loan to the Chrysler Corporation is the possibility that the company will be placed in federal bankruptcy or reorganization proceedings. In this regard, the following comment was made as to the rights of a mortgagee in bankruptcy under the previous Bankruptcy Act in G. Osborne, G. Nelson, Whitman, Real EstateFinance Law (Rev. Ed 1979) at 554:
 In theory, mortgagees should be unconcerned when insolvency forces mortgagors to file bankruptcy. Indeed, protection from such occurrences is the very reason for creation of mortgage security interests. In reality, however, mortgagees' rights, contractual and statutory, are often substantially affected by federal bankruptcy law, as many learn when they are forced into bankruptcy court to defend their security interests from the trustee's attack. Familiar state laws, requiring minimal time and effort to foreclose, are often neutralized by federal bankruptcy provisions which may freeze property for years. . . .
It should be noted that Congress has repealed the previous bankruptcy law and replaced it with a totally new bankruptcy code which became effective on October 1, 1979. While much of the substantive law and bankruptcy concepts under the old act will continue to be applicable under the new act, it is our understanding that the new act does make numerous significant changes in existing law and practice.
Therefore, this opinion should not be construed in any sense as a guarantee or unqualified prediction of the result of any bankruptcy litigation. Litigation and potential litigation is inherently a risky undertaking and for that reason the possibility always exists that contrary to expectation, a particular claim will or will not be successful.
 VII DISCUSSION OF NECESSITY OF WAIVERS BY CERTAIN CREDITORS
It has come to our attention that loans have been made to the Chrysler Corporation by banking and other corporations with agreements prohibiting the creation of secured debt by Chrysler in excess of specified amounts. If a loan is to be made to Chrysler by the State Employees' Retirement System secured by the Chelsea Proving Grounds, waivers would have to be secured from all such persons having claims against Chrysler so as to protect the Retirement System.
CONCLUSION
It is the opinion of this office with respect to the question concerning a loan of funds of the Missouri State Employees' Retirement System to the Chrysler Corporation to be secured by land in the state of Michigan that:
1. Section 379.080 RSMo authorizes a loan by the Retirement System secured by improved unencumbered real estate worth at least two times the amount of the loan;
2. Section 376.300 RSMo, Senate Bill 322, 80th General Assembly authorizes a loan by the Retirement System not exceeding one percent of the system's assets and not more than 75% of the fair market value of the unencumbered real estate;
3. The prudent man rule is applicable to the Board of Trustees of the Retirement System acting under either of the above sections.
Very truly yours,
 JOHN ASHCROFT Attorney General